**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**

JARED JOHNSON, individually and on behalf of all others similarly situated,

Plaintiff,

vs.

COMMONWEALTH FEDERAL CREDIT UNION, a/k/a COMMONWEALTH CREDIT UNION,

Defendant.

Civil Action No. 3:25-cv-42-GFVT

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS**

# TABLE OF CONTENTS


Introduction ........................................................................................................ 1

Facts & Procedural History ............................................................................... 2

I. In 2016, Mr. Johson signed a Member Service Agreement ("MSA") to open accounts at Commonwealth, but the terms of that 2016 MSA did not include arbitration ......................................................................... 2

II. Commonwealth claims that in 2020 it drafted a new MSA that contained arbitration terms, but it does not claim that it provided that 2020 MSA to Mr. Johnson. ......................................................................... 4

III. In 2021, Mr. Johnson signed a "Round Up Checking Account Conversion" document, but that document did not purport to incorporate any MSA containing arbitration, and Commonwealth does not claim—and Mr. Johnson denies—that Commonwealth ever gave him the 2020 MSA or other terms that included arbitration. ..................... 5

IV. In 2025, Mr. Johnson sues Commonwealth for disclosing customer personal and financial information to unauthorized third parties, to which Commonwealth responds by moving to compel arbitration under the 2020 MSA ......................................................................................... 7

Argument ............................................................................................................ 8

I. The Court should deny the motion because Commonwealth has failed to meet its burden to prove an agreement to arbitrate was formed ........... 8

A. The original 2016 MSA did not contain any agreement to arbitrate. ......................................................................................... 9

B. No agreement to arbitrate was formed when Commonwealth drafted the 2020 MSA with arbitration terms because Commonwealth did not provide (i.e., offer) those terms to Mr. Johnson. ......................................................................................... 9

C. The 2021 Conversion Card that Mr. Johnson signed did not incorporate the 2020 MSA, and the 2020 MSA was not provided to him at that time, either. ..................................................................... 10

Conclusion ......................................................................................................... 13

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bartelt Aviation, Inc. v. Dry Lake Coal Co.*,
682 S.W.2d 796 (Ky. App. 1985) ........ 9, 11

*Britt v. Univ. of Louisville*,
628 S.W.3d 1 (Ky. 2021) ........ 9

*Dixon v. Daymar Colls. Grp., LLC*,
483 S.W.3d 332 (Ky. 2015) ........ 9, 10, 11

*First Options of Chicago, Inc. v. Kaplan*,
514 U.S. 938, 115 S. Ct. 1920, 131 L.Ed.2d 985 (1995) ........ 8

*Floyd v. Parkview Council of Co-Owners, Inc.*,
664 S.W.3d 726 (Ky. Ct. App. 2023) ........ 10

*Granite Rock Co. v. Int'l Bhd. of Teamsters*,
561 U.S. 287, 130 S. Ct. 2847, 177 L.Ed.2d 567 (2010) ........ 8

*Majestic Oaks Homeowners Ass'n, Inc. v. Majestic Oaks Farms, Inc.*,
530 S.W.3d 435 (Ky. 2017) ........ 12

*Oakwood Mobile Homes, Inc. v. Sprowls*,
82 S.W.3d 193 (Ky. 2002), *as amended* (Aug. 26, 2002) ........ 10

*Ping v. Beverly Enters., Inc.*,
376 S.W.3d 581 (Ky. 2012) ........ 8

*Sevier Cnty. Schs. Fed. Credit Union v. Branch Banking & Tr. Co.*,
990 F.3d 470 (6th Cir. 2021), *cert. denied*, 142 S. Ct. 2770 (U.S. 2022) ........ 8

*Southard v. Newcomb Oil Co.*,
7 F.4th 451 (6th Cir. 2021) ........ 8

**Other Authorities**

11 Williston on Contracts § 30.25 (4th ed.2014) ........ 9, 11

## INTRODUCTION

The Court should deny Defendant Commonwealth Federal Credit Union's ("Commonwealth's") Motion to Compel Arbitration and Stay Proceedings because Commonwealth has failed to meet its burden to show it formed an enforceable agreement to arbitrate with Plaintiff Jared Johnson ("Mr. Johnson").

First, it is undisputed that the original 2016 Member Service Agreement ("2016 MSA") that Mr. Johnson signed to open his accounts with Commonwealth did *not* contain any arbitration provisions. So, the 2016 MSA cannot be the basis for compelling arbitration.

Second, although Commonwealth submits a 2020 Member Service Agreement ("2020 MSA") that contains arbitration terms, Commonwealth has not met its burden to show that Mr. Johnson ever agreed to that 2020 MSA. Indeed, Commonwealth has not shown that it ever even gave the 2020 MSA, or notice of it, to Mr. Johnson. And, without notice, there can be no meeting of the minds or assent to the 2020 MSA's arbitration terms.

Finally, Commonwealth's sleight-of-hand attempt to say that the 2020 MSA was incorporated by reference when, in 2021, Mr. Johnson signed a "Round Up Checking Conversion" (the "2021 Conversion Card") fails under examination. The 2021 Conversion Card does not even mention the 2020 MSA, let alone incorporate it. Rather, the 2021 Conversion Card lists other, undated documents with different names, none of which is the 2020 "Member Service Agreement." No one from Commonwealth testifies that it gave Mr. Johnson the 2020 MSA when he signed 2021 Conversion Card, either, and Mr. Johnson says no one did, so there was no

physical incorporation. Under Kentucky law, for incorporation by reference to be effective, "it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms." Quite simply, because the 2020 MSA was not even mentioned or clearly indicated in the 2021 Conversion Card, nor provided to Mr. Johnson, Commonwealth cannot show it was incorporated by reference and, therefore, cannot show Mr. Johnson agreed to it. Accordingly, the Court should deny Commonwealth's motion to compel arbitration because Commonwealth has failed to meet its burden to show an agreement to arbitrate was formed.

## FACTS & PROCEDURAL HISTORY

### I. In 2016, Mr. Johnson signed a Member Service Agreement ("MSA") to open accounts at Commonwealth, but the terms of that 2016 MSA did not include arbitration.

In July 2016, Mr. Johnson signed Part 1 of a Member Service Agreement (the "2016 MSA") with Commonwealth, which is a 1-page document commonly known as an "Account Card." Declaration of Jared Johnson ("Johnson Decl.") ¶ 2; Declaration of Blake Manning ("Manning Decl.") ¶¶ 4–5, Dkt. No. 9-6; 2016 Member Service Agreement Part 1 ("Account Card"), Dkt. No. 9-2. At that time, Mr. Johnson also received Part 2 of the 2016 MSA, containing roughly thirty pages of terms and disclosures. Johnson Decl. ¶ 2; Manning Decl. ¶ 5; 2016 Member Service Agreement Part 2, Dkt. No. 9-3.

Part 1, the Account Card, looked like this:

**Member Service Agreement • Part 1**

COMMONWEALTH CREDIT UNION

PO Box 978
Frankfort, KY 40602-0978
PH: 502-564-4775
TF: 800-228-6420
www.ccuky.org

**OWNER INFORMATION** (An owner can open, initiate, REDACTED close an account, product or service) 1

JARED T JOHNSON — **Owner 1 Name**
REDACTED — Address
Frankfort — City | KY — State | 40601-1450 — ZIP

REDACTED — Home Phone | Cell Phone
Mailing Address (if different from physical address) | City | State | ZIP

E-mail Address
REDACTED — Social Security Number
REDACTED — Date of Birth
KYDL J09942884 6/07/2012 8/06/2013 — Driver's License – State, Number & Issue and Exp. Date

Employer | Occupation | Work Phone
Existing Member/Family Relation — County where you live, work, worship, attend school or volunteer

**ACCOUNT(S)** xxxxxx8708 ☑ Regular Savings ☐ Money Market Account ☑ Commonwealth Checking ☐ Round Up Checking 2

☐ Christmas Account ☐ Vacation Club ☐ Hideaway Savings ☐ Certificate of Deposit ☐

**CERTIFICATE ACCOUNT ANNUAL PERCENTAGE YIELD (APY), RATE & TERMS** (As Applicable) 3

Term | Amount | Rate | Annual % Yield | Maturity Date

**Dividends to:** ☐ Remain in Acct. ☐ Deposit to Acct. **On Maturity:** ☐ Remain in Acct. ☐ Deposit to Acct.

**SERVICE(S)** ☐ Debit Card ☑ Online Banking ☐ eStatements ☐ Pay Overdrafts for Debit/ATM 4

**MULTIPLE OWNER'S INFORMATION** (An owner can open, initiate, conduct transactions on, maintain, change, add, terminate and close an account, product or service) 5

**Owner 2 Name** | Address | City | State | ZIP
Home Phone | Cell Phone | Social Security Number | Date of Birth | E-mail Address
Driver's License – State, Number & Issue and Exp. Date | Employer | Work Phone | Occupation

**Owner 3 Name** | Address | City | State | ZIP
Home Phone | Cell Phone | Social Security Number | Date of Birth | E-mail Address
Driver's License – State, Number & Issue and Exp. Date | Employer | Work Phone | Occupation

**BENEFICIARY/PAYABLE ON DEATH PAYEE DESIGNATION(S)** (People or organizations to receive the funds held in the account(s) on the death of the final owner) 6

Beneficiary/POD Payee **1** Name | Relationship | Beneficiary/POD Payee **2** Name | Relationship | Beneficiary/POD Payee **3** Name | Relationship
Beneficiary/POD Payee **4** Name | Relationship | Beneficiary/POD Payee **5** Name | Relationship | Beneficiary/POD Payee **6** Name | Relationship

**TAX INFORMATION CERTIFICATION:** *By signing below, I certify under penalties of perjury that: (i) I am a US citizen or other US person, (ii) the Social Security Number (SSN)/Employer Identification Number (EIN) shown is my/the correct identification number and (iii) I am NOT, unless designated below, subject to backup withholding because I am exempt or I have not been notified by the IRS that I am subject to backup withholding as a result of a failure to report all dividends or interest, or because the IRS has notified me that I am no longer subject to backup withholding.* 7

☐ *I am subject to backup withholding* ☐ *Exempt* ☐ *I am not a United States citizen or resident (complete W-8 form)*

**ACKNOWLEDGMENT:** Owner 1 is (or represents) a member, or applies for membership pursuant to Commonwealth Credit Union's (referred to as "we", "us" & "our") bylaws, policies, and this Member Service Agreement (referred to as the MSA and Parts 1 & 2). All owners (referred to as "you" & "your") request the accounts, products and services selected on this Part 1 form, and acknowledge receiving Part 2 (the terms and conditions) of this MSA, which includes the Funds Availability disclosures, Electronic Fund Transfer disclosures, Privacy Policy and Rate & Fee disclosures. Part 2 has been e-mailed to Owner 1's address if available. To provide you with excellent service and for identification purposes, you agree we may review and image your current identification, and obtain and use credit, account and employment reports to verify your eligibility for accounts, products and services we may offer. You affirm the information provided in this Part 1 is accurate, and has been completed according to your instructions. You understand this MSA governs your accounts, products, services and other aspects of your relationship with us whether initiated now or in the future, and agree that we may rely exclusively on this MSA and have no obligation to rely on any other documents. You also understand an owner may conduct transactions on and open, initiate, maintain, change, add, close or terminate accounts, products and services, as explained in Part 2 of this MSA. If you provide a mobile phone number, you agree we may text and call you at the number about products and services that you have or we may offer. To benefit all members, you agree we may change this MSA, and those changes are binding on you. You understand you may call us with questions or obtain a copy of this MSA from us during business hours (and Part 2 from our website at any time), and may open, initiate, maintain, change, add, close or terminate an account, product, service or membership at any time according to this MSA. To assure consent to and the legibility and accuracy of this Part 1 form, you agree that we may require this Part 1 to be notarized or re-completed and re-signed. By signing or otherwise authorizing this Part 1, by using an account, product or service, or by receipt or availability of a statement, you agree to this MSA Parts 1 & 2. *The IRS does not require your consent to any provision of this MSA other than the certification required to avoid backup withholding* (in Section 7 above). 8

Owner 1 Signature | Owner 2 Signature | Owner 3 Signature

I agree to be removed as an owner from the account(s) ______________________ Date 07/01/2016

**OFFICE USE ONLY**
LORI BRIGHT — CU Employee Name | 0235 — Teller Number | Existing Member/Family Relation — Field of Membership | 07/01/2016 — Date 9
O O|R|A Notes Additional Service Request
Addt'l Notes added checking account

**Copyright © 2015 Farleigh Wada Witt. All Rights Reserved.** *This AGMSA document may not be reproduced without written permission from Farleigh Wada Witt.* MSA Part 1 06-08-15

Account Card, Dkt. No. 9-2.

Importantly, this Account Card, i.e., Part 1, expressly incorporated the terms in Part 2 and stated in the "Acknowledgment" section that, by signing, Mr. Johnson agreed to be bound by:

> *this* Membership Service Agreement (referred to as the MSA and Parts 1 & 2). . . . You . . . may change . . . an account . . . at any time according to *this* MSA. . . . To assure consent to . . . *this* Part 1 form, you agree that we may require *this* Part 1 to be . . . re-completed and re-signed. By signing or otherwise authorizing *this* Part 1 . . . you agree to *this* MSA Parts 1 & 2.

Account Card, Dkt. No. 9-2 (emphasis added). It is undisputed that *"this* MSA," i.e., both Parts 1 & 2 of the 2016 MSA, did *not* contain any terms requiring or relating to arbitration. *See* Account Card, Dkt. No. 9-2; 2016 Member Service Agreement Part 2, Dkt. No. 9-3.

## II. Commonwealth claims that in 2020 it drafted a new MSA that contained arbitration terms, but it does not claim that it provided that 2020 MSA to Mr. Johnson.

At some point in 2020, Commonwealth claims it created a new Master Service Agreement that contained arbitration terms and that was titled "Member Service Agreement." Manning Decl. ¶¶ 9–10, Dkt. No. 9-6; 2020 Member Service Agreement Part 2 ("2020 MSA"), Dkt. No. 9-5. However, Commonwealth does *not* claim that it provided this 2020 MSA to Mr. Johnson or obtained his assent at this time. *See generally* Manning Decl. ¶¶ 9–10.

## III. In 2021, Mr. Johnson signed a "Round Up Checking Account Conversion" document, but that document did not purport to incorporate any MSA containing arbitration, and Commonwealth does not claim—and Mr. Johnson denies—that Commonwealth ever gave him the 2020 MSA or other terms that included arbitration.

In 2021, Mr. Johnson signed a "Round Up Checking Conversion" document (the "2021 Conversion Card") to convert his checking account so that Commonwealth would round up his checking payments to the nearest dollar, depositing the extra amount into his savings account. Johnson Decl. ¶ 4. Unlike in 2016 when he opened his accounts, in 2021 Mr. Johnson did *not* sign a new Account Card, a/k/a new Master Service Agreement Part 1 stating he agreed to a new Master Service Agreement Part 2. Johnson Decl. ¶ 3. The 2021 Conversion Card looked nothing like the Account Card Mr. Johnson signed in 2016, but instead, the front page looked like this:

COMMONWEALTH
CREDIT UNION

P.O. Box 978
Frankfort, KY 40602-0978

**Round Up Checking Account Conversion**

OFFICIAL USE ONLY
REQUEST RECEIVED: (●) In Office ( ) By Mail/Other
Teller #: 0195

**Member Name:**

**Account Number:** REDACTED8708 **Share ID #:** 03

(●) **Please convert my existing checking account to a Round-Up Checking Account. Also, create the Round-Up Savings Share for my Savings!**

( ) **Please convert my existing Round-Up Checking account back to a Commonwealth Checking Account.**

MEMBER SIGNATURE ______ DATE 03/25/2021

2021 Conversion Card, Dkt. No. 9-4. And Commonwealth claims that the backside looked like this:

1. When you enroll in the Round-Up Checking Program, Commonwealth Credit Union will round-up the amount of any debit card purchases associated with your checking account to the next whole dollar amount, and transfer the amount in excess of the purchase amount from your checking account to your Round-Up Savings Account.
2. The Credit Union will aggregate the rounded up amounts from purchases that post to your checking account each business day and make a single transfer ("daily round-up transfer") at the end of the business day. If on a business day you do not have sufficient available funds in your checking account, or if any transaction has overdrawn your checking account, we do not round up purchases posted on that business day and we cancel the daily round-up transfer for that day.
3. If your debit card purchase is subsequently cancelled or reversed, such as a returned purchase, the corresponding daily round-up transfer will remain in the Round-Up Savings Account. Credit transactions or adjustment transactions will not be rounded-up.
4. Once enrolled, if you later decide you no longer want to participate in the Round-Up Checking Program, you must close both the Round-Up Checking and the Round-Up Savings Account.
5. The Credit Union reserves the right to cancel or modify the Round-Up Program at any time.

ROUND-UP CHECKING ACCOUNT MATCH PROGRAM:

1. The Credit Union will match 100% of the daily round-up transfers that post to the Round-Up Savings Account in the first 90 calendar days after enrolling in the program. (This will be paid at the beginning of the following month after the 90 calendar days)
2. After the first 90 calendar day period, the Credit Union will match 5% of the daily round-up transfers that post to the Round-Up Savings Account, with a $250 maximum match. (The 5% match will be paid annually, the month after the anniversary date of the account opening)
3. To receive the Credit Union Match ("CU match"), you must be enrolled in the Round-Up Checking Program and be enrolled in On-line banking and E-statements. If you withdraw from E-statements, then you will no longer receive the CU Match.
4. The CU match amount will be credited to the Round-Up Savings Account the month after the anniversary date of the account opening and will be based on the accumulated round-up contributions for that time frame.
5. The annual cap on the CU match amount is $250.00.
6. The annual amount of the CU match will be reported to the IRS on Form 1099-MISC.
7. The Credit Union reserves the right to cancel or modify the Round-Up Checking Match Program at any time.
8. If you close your Round-Up Checking Account before the CU match amount is posted to the share, you will not receive the CU match. In the event you should close your Round-Up Checking, your Round-Up Savings will also be closed. The money in the account will be transferred to your primary savings account.

ROUND-UP SAVINGS RATE AND DIVIDEND CREDITING INFORMATION:

1. The dividend rate and annual percentage yield ("APY") for this account is set at a standard 5% on the Round-Up Savings Account. The applicable dividend rate is paid on the entire balance in your account annually. The Round-Up Checking account will not earn dividends.
2. The dividend rate and the APY may change at any time at the sole discretion of Commonwealth Credit Union.
3. Dividends are paid annually, at the end of the calendar year.
4. If you close your account before dividends are credited, you will not receive the accrued dividends.

MINIMUM BALANCE REQUIREMENTS:

1. There are no minimum balance requirements to open or maintain this share account.

FEE INFORMATION:

1. Fees and charges may be assessed against your account. See Fee Schedule for current fees.

TRANSACTION LIMITATIONS FOR ROUND-UP SAVINGS:

1. Deposits other than the daily Round-Up transfer and 90 day and annual match are not permitted on this Share Account.
2. ATM/Debit Card transactions are not permitted on this share account.
3. ACH deposits and withdrawals are not permitted on this share account.
4. Funds in the Round-Up Share Account can not be used as overdraft protection for any other share account.

OTHER TERMS AND CONDITIONS:

1. Changes in the terms and conditions of this account may be made at the discretion of the Credit Union. The Credit Union will give you advance notice of changes if required to do so under applicable law.
2. By opening an account and signing the Account Card, you acknowledge that you have received and agree to the additional terms and conditions as stated in the Membership and Account Agreement, General Fee Schedule, and Rate Sheet which are incorporated by reference into this Disclosure.

*Revised*

*Id.* It is undisputed that neither the front nor the back side of the 2021 Conversion Card contained any terms relating to arbitration. *See id.* Nor does the 2021 Conversion Card mention the 2020 MSA. *Id.*

The very last sentence of the last page of the 2021 Conversion Card states:

> By opening and signing the Account Card, you acknowledge that you have received and agree to the additional terms and conditions as stated in the Membership and Account Agreement, General Fee Schedule, and Rate Sheet which are incorporated by reference into this disclosure.

*Id.* As Mr. Johnson states, he was "not given anything with the title 'Membership and Account Agreement, General Fee Schedules, and Rate Sheet' at that time" and he "was also not given the 2020 MSA," even though it does not have the title listed in the Conversion Card. Johnson Decl. ¶ 5. At this time, the only MSA given to Mr. Johnson was the 2016 MSA that did not contain any arbitration terms, and he was not aware of any other MSA. Johnson Decl. ¶¶ 4–5.

## IV. In 2025, Mr. Johnson sues Commonwealth for disclosing customer personal and financial information to unauthorized third parties, to which Commonwealth responds by moving to compel arbitration under the 2020 MSA.

In 2025, Mr. Johnson sued Commonwealth in a class action in this Court for disclosing Mr. Johnson's and other members' personal and financial information to unauthorized third parties. Class Action Compl., Dkt. No. 1.

In response to that motion, Commonwealth moved to compel arbitration. Dkt. No. 9. Commonwealth argues that Mr. Johnson agreed to arbitration when he signed the 2021 Conversion Card. According to Commonwealth, the 2021 Conversion Card incorporated the 2020 MSA—even though the 2021 Conversion Card does not contain any reference to a "Master Service Agreement," even though

Commonwealth did not provide the 2020 MSA to Mr. Johnson, and even though Mr. Johnson denies any knowledge of, or agreement to, the 2020 MSA or its arbitration terms. Johnson Decl. ¶¶ 4–6.

**ARGUMENT**

**I. The Court should deny the motion because Commonwealth has failed to meet its burden to prove an agreement to arbitrate was formed.**

The Court should not compel arbitration because Commonwealth has not met its burden to prove any enforceable agreement to arbitrate was formed with Mr. Johnson. Under both federal and Kentucky law, "a party seeking to compel arbitration has the initial burden of establishing the existence of a valid agreement to arbitrate" by a preponderance of the evidence. *Ping v. Beverly Enters., Inc.*, 376 S.W.3d 581, 590 (Ky. 2012) (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 115 S. Ct. 1920, 131 L.Ed.2d 985 (1995)). There is no presumption in favor of arbitration when determining whether an agreement to arbitrate was formed. *Southard v. Newcomb Oil Co.*, 7 F.4th 451, 454 (6th Cir. 2021) ("the 'presumption' favoring arbitration, as it is sometimes called, applies only to the scope of an arbitration agreement, not to its existence") (citing *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 302–03, 130 S. Ct. 2847, 177 L.Ed.2d 567 (2010)). Instead, "arbitration is a matter of contract between the parties, and one cannot be required to submit to arbitration a dispute which it has not agreed to submit to arbitration." *Id.* (quotations omitted).

Whether an agreement to arbitrate has been formed is determined under "ordinary state-law principles that govern the formation of contracts." *Sevier Cnty.*

*Schs. Fed. Credit Union v. Branch Banking & Tr. Co.*, 990 F.3d 470, 475 (6th Cir. 2021), *cert. denied*, 142 S. Ct. 2770 (U.S. 2022). Under Kentucky law, "[t]he essential elements of a valid contract are an offer and unequivocal acceptance, a certain and complete recitation of the material terms, and consideration." *Britt v. Univ. of Louisville*, 628 S.W.3d 1, 5 (Ky. 2021). And "[f]or a contract validly to incorporate other terms, 'it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms.'" *Dixon v. Daymar Colls. Grp., LLC*, 483 S.W.3d 332, 344 (Ky. 2015) (quoting 11 Williston on Contracts § 30.25 (4th ed.2014) (compiling cases from various jurisdictions)). In addition, there must be "clear language" incorporating the additional terms *Id.* (quoting *Bartelt Aviation, Inc. v. Dry Lake Coal Co.*, 682 S.W.2d 796, 797 (Ky. App. 1985)).

Here, Commonwealth has failed to meet its burden to prove an agreement to arbitrate was ever formed with Mr. Johnson, so the Court should deny the motion.

**A. The original 2016 MSA did not contain any agreement to arbitrate.**

First, there can be no argument that when Mr. Johnson signed the Account Card in 2016 he agreed to arbitration because it is undisputed that there were no terms regarding arbitration in the 2016 MSA. Thus, there was no offer and acceptance of arbitration terms at that time.

**B. No agreement to arbitrate was formed when Commonwealth drafted the 2020 MSA with arbitration terms because Commonwealth did not provide (i.e., offer) those terms to Mr. Johnson.**

Second, there can be no argument that Mr. Johnson agreed to arbitration when Commonwealth drafted the 2020 MSA in October 2020 because there is no

evidence Commonwealth ever provided the 2020 MSA to Mr. Johnson at that time. *See* Manning Decl. ¶¶ 9–10. Thus, again, there was no offer and acceptance of arbitration terms at that time. *See, e.g.*, *Oakwood Mobile Homes, Inc. v. Sprowls*, 82 S.W.3d 193, 199 (Ky. 2002), *as amended* (Aug. 26, 2002) (movant cannot show other party agreed to arbitration terms "without [the other party] having actual knowledge" of those terms); *Floyd v. Parkview Council of Co-Owners, Inc.*, 664 S.W.3d 726, 730 (Ky. Ct. App. 2023) (no assent where there was no evidence that one party was even aware of terms the other party had drafted).

### C. The 2021 Conversion Card that Mr. Johnson signed did not incorporate the 2020 MSA, and the 2020 MSA was not provided to him at that time, either.

Finally, Commonwealth's argument that Mr. Johnson agreed to the 2020 MSA and its arbitration terms when he signed the 2021 Conversion Card fails the slightest scrutiny. It is undisputed that the 2021 Conversion Card does not mention arbitration terms itself. 2021 Conversion Card, Dkt. No. 9-4. And, contrary to Commonwealth's arguments, the 2020 MSA was not incorporated by reference into the 2021 Conversion Card. *Id.* Indeed, the 2021 Conversion Card never even mentions the 2020 MSA, Commonwealth provides no statement that it gave the 2020 MSA to Mr. Johnson at that time (or any time), and Mr. Johnson denies that Commonwealth ever gave him the 2020 MSA at that time (or any time).

For incorporation by reference to be effective, the identity of the document being incorporated must be clear. *Dixon*, 483 S.W.3d at 344. That may be accomplished through various means, such as attaching the document, including it within a packet, or referring to it by its title. But, here, there is no such clear

reference. The 2020 MSA was never given to Mr. Johnson, either along with the Conversion Card or otherwise. And the title of the MSA is different than the title of the documents referenced in the Conversion Card. To make matters worse, when Commonwealth wished to refer to an MSA previously with Mr. Johnson, as in Part 1 of the 2016 MSA, it specifically made such reference by the name "Member Service Agreement," not by any of the titles listed in the 2021 Conversion Card.

"For a contract validly to incorporate other terms, 'it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms.'" *Dixon*, 483 S.W.3d at 344 (quoting 11 Williston on Contracts § 30.25 (4th ed. 2014)). In addition, there must be "clear language" incorporating the additional terms *Id.* (quoting *Bartelt Aviation*, 682 S.W.2d at 797). The facts show neither of these requirements is met.

First, there is not "clear language" in the 2021 Conversion Card incorporating the 2020 MSA. The only incorporation language in the 2021 Conversion Card says:

> By opening and signing the **Account Card**, you acknowledge that you have received and agree to the additional terms and conditions as stated in the **Membership and Account Agreement, General Fee Schedule, and Rate Sheet** which are incorporated by reference into this disclosure.

2021 Conversion Card, Dkt. 9-4 at 2 (emphasis added). This purports to incorporate documents with capitalized titles called "Membership and Account Agreement, General Fee Schedule, and Rate Sheet," not "Membership Service Agreement," which is the title of the 2020 MSA. 2020 MSA, Dkt. No. 9-5. Commonwealth has not produced any documents entitled "Membership and Account Agreement, General Fee Schedule, and Rate Sheet," which are the documents purportedly incorporated,

*not* the 2020 MSA, so there is no evidence what this sentence actually incorporates (or if these documents even exist). And there is no evidence that the MSA was ever called by the parties under the name "Membership and Account Agreement, General Fee Schedule, and Rate Sheet." Indeed, the parties have always referred to the MSA as the "Member Service Agreement," not the other titles incorporated in the 2021 Conversion Card. *See* Account Card, Dkt. No. 9-2; 2016 MSA, Dkt. No. 9-3. This alone means that the 2021 Conversion Card failed to clearly incorporate the 2020 MSA because it is ambiguous what is actually being incorporated.

Second, even if somehow "Membership and Account Agreement, General Fee Schedule, and Rate Sheet" could be read to mean "Member Service Agreement," which has no support in the record for the parties' understanding, that would still not clearly incorporate the 2020 MSA because there is no date stated. Mr. Johnson testifies that he was never given and was unaware of the 2020 MSA, meaning that to him—at best—this language would have referred to the 2016 MSA, which he was given and aware of and which contains no arbitration terms. Johnson Decl. ¶ 5. That understanding would be bolstered by the fact that Mr. Johnson signed an "Account Card" in 2016 agreeing to the 2016 MSA, but was signing a "Conversion Card" in 2021, again, at best, meaning that he was agreeing he was still bound by the 2016 MSA he agreed to when he signed the Account Card in 2016. Johnson Decl. ¶ 3. Thus, there is no unambiguous language incorporating the 2020 MSA. And ambiguity must be construed against Commonwealth. *Majestic Oaks Homeowners Ass'n, Inc. v. Majestic Oaks Farms, Inc.*, 530 S.W.3d 435, 441 (Ky.

2017) ("[T]his Court follows the contract interpretation canon historically known by the useful Latinism, *contra proferentem*: When interpreting contracts susceptible to two meanings, we construe ambiguity against the drafter.").

Third, Commonwealth has not shown that Mr. Johnson had "knowledge of and assented to" the 2020 MSA, both because it did not clearly incorporate it, but, even more so, because Commonwealth does not even state that it gave Mr. Johnson the 2020 MSA. And Mr. Johnson denies that he was given or aware of the 2020 MSA. Johnson Decl. ¶ 4.

All of this is fatal to Commonwealth's attempt to compel arbitration. Both the lack of clear reference and the failure to provide the 2020 MSA doom its argument for incorporation by reference. Commonwealth has not met its burden to prove an enforceable agreement to arbitrate was formed.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendant's Motion to Compel Arbitration and Stay Proceedings.

Dated: January 8, 2026

Respectfully submitted,

/s/ Vess A. Miller
Lynn A. Toops (*pro hac vice*)
Vess A. Miller (*pro hac vice*
COHENMALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
T: (317) 636-6481
ltoops@cohenmalad.com
vmiller@cohenmalad.com

Andrew E. Mize (Ky. Bar No. 94453)
J. Gerard Stranch, IV (*pro hac vice*)
STRANCH, JENNINGS & GARVEY, PLLC
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
T: (615) 254-8801
F: (615) 255-5419
gstranch@stranchlaw.com
eschiller@stranchlaw.com

Samuel J. Strauss (*pro hac vice*)
Raina C. Borrelli (*pro hac vice*)
STRAUSS BORRELLI, PLLC
980 N. Michigan Avenue, Suite 1610
Chicago, Illinois 60611
T: (872) 263-1100
F: (872) 263-1109
sam@straussborrelli.com
raina@straussborrelli.com

* to seek admission pro hac vice

**CERTIFICATE OF SERVICE**

I hereby certify that on January 8, 2026, a true and correct copy of the foregoing document was served on all counsel of record via CM/ECF.

/s/Vess A. Miller
*Attorney for Plaintiff*