UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

| | | |
|---|---|---|
| JARED JOHNSON, *Individually and on behalf of all others similarly situated*, | ) ) ) | |
| Plaintiff, | ) ) | Civil No. 3:25-cv-00042-GFVT |
| v. | ) ) | **MEMORANDUM OPINION** |
| COMMONWEALTH FEDERAL CREDIT UNION, | ) ) ) ) ) | **&** **ORDER** |
| Defendant. | | |

*** *** *** ***

This matter is before the Court on the Defendant's Motion to Compel Arbitration and Stay Proceedings. [R. 9.]  Commonwealth Credit Union requests that this court stay proceedings and compel arbitration.  For the reasons that follow, the Motion will be **DENIED**.

**I**

Plaintiff Jared Johnson first became a member with Commonwealth Credit Union in 2016. [R. 9-1 at 5; R. 26 at 2; R. 9-8 at 2.]  Upon doing so, Johnson entered into a membership agreement – the 2016 Member Service Agreement – with Commonwealth, setting forth the terms and conditions of his membership. [R. 9-8 at 2; R. 26-1 at 1.]  The Member Service Agreement consisted of two separate documents.  The first was a one-page Account Card upon which Johnson provided his personal information, and which contained an acknowledgement that, by signing, Johnson had received the full version of the MSA and agreed to abide by its terms as the governing document of his membership.  The Account Card expressly purported to incorporate by reference "this Member Service Agreement[.]" [*Id*.]  The second document was the full Member Service Agreement, which contained approximately thirty pages of terms, conditions, and required disclosures.  The Member Service Agreement did not, at this time, contain an

arbitration provision. [R. 9-3.]  Johnson signed the Account Card on July 1, 2016, and his membership commenced.[1] [R. 26-1.]

Several years later, in 2020, Commonwealth amended its Member Service Agreement. Among the new terms and conditions was an arbitration clause, which contained a class action waiver. [R. 9-1 at 6-8; R. 26 at 4; R. 9-5.]  Commonwealth claims that, at this time, a copy of the new Member Service Agreement was sent, via U.S. Mail, to the listed addresses of all members, along with instructions on how to access and review the revised version. [R. 30-2 (notice); R. 30-3 at 1-2.]  The scope of the arbitration clause was broad and explicitly pertained to "[c]laims or disputes between you and us arising out of or relating to the account(s) you have with us, transactions involving the account(s), safe deposit box, and any related service with us." [R. 9-5 at 30-31.]  It also contained a clause prohibiting the pursuit of either class action litigation or class-wide arbitration. [*Id*.]  It further provided that the member "[has] the right to opt-out of this agreement to arbitrate if you tell us within 30 days of the opening of the account(s) you have with us or the receipt of this notice, whichever is later." [*Id*.]

Commonwealth does not contend that this updated version somehow applied automatically to existing members, such as Johnson.  The following year, however, Johnson elected to modify his account to participate in Commonwealth's "Round Up Checking Account" program.[R. 9-6 at 2; R. 26-1 at 2.]  To facilitate this transition, Johnson executed a "Conversion Card" on March 25, 2021. [*Id*.]  The Conversion Card, much like the 2016 Account Card, was succinct and purported to incorporate by reference other documents. [R. 9-9 at 2-3.]  The bulk of the Conversion Card provided general information about the Round Up Checking Account

---

[1] Commonwealth contends that Johnson received and signed another account card in 2019 which again purported to incorporate by reference the Member Service Agreement.  This fact, even if true, does not alter the analysis. Ultimately, even if he did so, the MSA did not contain an arbitration provision until the modifications were made in 2020.  Therefore, an arbitration agreement could not have been formed at that time.

2

program and other relevant financial and tax-related information. At the bottom, however, it provided:

> By opening an account and signing the Account Card, you acknowledge that you have received and agree to the additional terms and conditions as stated in the Membership and Account Agreement, General Fee Schedule, and Rate Sheet which are incorporated by reference into this Disclosure.

[R. 9-9 at 3.] Johnson asserts that he did not receive a copy of these documents concurrent with the Conversion Card. [R. 26-1.] The Conversion Card did not mention a document called "Member Service Agreement" and did not otherwise mention arbitration. Johnson also claims that he was not provided with a copy of the Member Service Agreement at this time, or any other. [*Id.*] Put simply, Johnson contends that he signed the Conversion Card with no knowledge of the 2020 MSA, or its accompanying arbitration provision.

Johnson filed this class action suit on August 22, 2025, contending that Commonwealth disclosed its members' nonpublic personal information and personally identifiable financial information to third parties, including Google, LLC, in violation of state and federal law. [R. 1.] In lieu of an answer, Commonwealth filed the instant motion to compel arbitration and stay proceedings on October 28, 2025. [R. 9.] This motion is now fully briefed and ripe for judicial review.

## II

The Federal Arbitration Act "establishes a liberal policy favoring arbitration agreements." *Parker v. Tenneco, Inc.*, 114 F.4th 786, 792 (6th Cir. 2024) (quoting *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 505 (2018)). "This policy is not an open invitation for the Court to 'devise novel rules to favor arbitration over litigation,' but rather an 'acknowlegement of the FAA's commitment … to place [arbitration] agreements upon the same footing as other contracts." *Johnson v. HCL Am., Inc.*, 2025 U.S. Dist. LEXIS 229391, at \*5-6 (E.D. Ky. Nov. 18, 2025) (quoting *Morgan v. Sundance, Inc.*, 596 U.S. 411, 418 (2022); *Granite Rock Co. v.*

3

*Int'l Broth. of Teamsters*, 561 U.S. 287, 302 (2010)).  Where a valid arbitration agreement exists, a party can seek to compel arbitration, and stay the case in the interim, pursuant to the FAA. 9 U.S.C. §§ 3-4.

This presumption, however, is not boundless.  Relevant here, the "presumption in favor of arbitration," relates only to the scope of valid, existing arbitration agreements; it does not mean there is a presumption when addressing whether the parties entered into a valid agreement to arbitrate in the first place. *Southard v. Newcomb Oil Co.*, LLC, 7 F.4th 451, 454 (6th Cir. 2021) (citing *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 302-03 (2010)).  Rather, in following the FAA's stated purpose of placing arbitration agreements on the same footing as other contracts, questions about the formation of an arbitration agreement are resolved by reference to principles of standard contract law. *Seawright v. Am. Gen. Fin. Servs., Inc.*, 507 F.3d 967, 972 (6th Cir. 2007) (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943-44 (1995); see also *Hergenreder v. Bickford Senior Living Grp., LLC*, 56 F.3d 411, 416-17 (6th Cir. 2011) (same).

The Sixth Circuit has determined that district courts addressing a motion to compel arbitration must engage in a three-step analysis.  It "must assure itself that (1) the parties agreed to arbitrate; (2) the claims asserted fall within the scope of the arbitration agreement and (3) Congress did not intend for those claims to be non-arbitrable." *Bruce v. Adams & Reese, LLP*, 168 F.4th 367, 375 (6th Cir. 2026) (quoting *Memmer v. United Wholesale Mortg., LLC*, 135 F.4th 398, 404 (6th Cir. 2025)).  Here, the dispute revolves around, and is ultimately disposed by, the first step.  And, as already stated, this question is resolved by reference to state contract law.  "[A]nalogy to summary judgment provides the right way to assess a motion to compel arbitration." *Boykin v. Fam. Dollar Stores of Mich., LLC*, 3 F.4th 832, 838 (6th Cir. 2021).

The central dispute here involves a single issue: whether Johnson entered into a valid arbitration agreement with Commonwealth.  Commonwealth argues it prevails in several ways. First, Commonwealth contends that Johnson agreed to arbitrate when he signed the 2021 Conversion Card which purported to incorporate by reference the "Membership and Account Agreement." [R. 9-1 at 8-15.]  Next, and more obliquely, Commonwealth suggests that the Court should reform the agreement to correct a "scrivener's error," thereby replacing the erroneous document title "Membership and Account Agreement," with the correct title, "Member Service Agreement." [R. 30 at 4-12.]  The Court finds each of these arguments unpersuasive and concludes that Johnson and Commonwealth did not enter into a valid arbitration agreement.

**A**

The primary argument raised by Commonwealth posits that Johnson entered into an agreement to arbitrate when he signed the 2021 Conversion Card which sought to incorporate by reference a document entitled "Membership and Account Agreement." [R. 9-1 at 11-12.] Johnson, in turn, contends that the 2020 Member Service Agreement, which contained the arbitration clause, cannot be incorporated by the Conversion Card, because it erroneously referred to the document as the "Membership and Account Agreement." [R. 26 at 11-16.]  The Court agrees.

Under Kentucky law, "[t]he essential elements of a valid contract are an offer an unequivocal acceptance, a certain and complete recitation of the material terms and consideration." *Britt v. Univ. of Louisville*, 628 S.W.3d 1, 5 (Ky. 2021) (citing *Hines v. Thomas Jefferson Fire Ins. Co.*, 267 S.W.2d 709 (Ky. 1953); *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 384 (Ky. Ct. App. 2002)).  Further, "the terms of the contract must be sufficiently definite to enable the court to determine the measure of damages in the event of breach." *Id.* (citing *Kovacs v. Freeman*, 957 S.W.2d 251, 254 (Ky. 1997)).  "It is black letter law

5

that multiple documents, each individually incomplete, may form a contract, when combined and read as one to provide the necessary elements of contract formation." *Univ. of Ky. v. Regard*, 670 S.W.3d 903, 912 (Ky. 2023) (citing *Sackett v. Maggard*, 134 S.W. 888, 890 (Ky. 1911)).  In order for this doctrine of incorporation by reference to apply, "it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms," and there must be "clear language expressing the incorporation of other terms and conditions." *Dixon v. Daymar Colleges Grp., LLC*, 483 S.W.3d 332, 344 (Ky. 2015); see also *Britt*, 628 S.W.3d at 8.  "Terms and conditions incorporated by reference are enforceable." *Home Lumber Co. v. Appalachian Reg'l Hosps., Inc.*, 722 S.W.2d 912, 914 (Ky. Ct. App. 1987).

In *Regard*, the Kentucky Supreme Court sought to resolve disagreement as to the meaning of "clear language expressing the incorporation of other terms and conditions," the second prong of the incorporation analysis.  Kentucky courts have cited the Restatement of Contracts (Second) § 132, as authority for the elements of incorporation by reference.  Relevant here, comment c of § 132 provides:

> It is sufficient that the signed writing refers to the unsigned writing explicitly or by implication, or that the party to be charged physically attaches one document to the other or encloses them in the same envelope.  Even if there is no internal reference or physical connection, the documents may be read together if in the circumstances they clearly relate to the same transaction and the party to be charged has acquiesced in the contents of the unsigned writing.

Rest. (Second) of Contracts § 132, cmt. c.  From this, the *Regard* Court concluded that "what the law demands is a clear reference to the document *being incorporated*," rather than the language "*of incorporation*." *Regard*, 670 S.W.3d at 913 (citing 11 Williston on Contracts § 30:25 (4th ed.)) (emphasis in original).  The "clear reference," to the incorporated document must be such that "its identity may be ascertained beyond doubt." *Id*.  In sum, the Court in *Regard* ultimately concluded that:

the common law in Kentucky has never required clear and unequivocal language of incorporation – that an incorporated document will control or decide the relationship of the parties.  Instead, mutuality of subject matter, and surrounding circumstances not inconsistent with the writings, is sufficient so long as the document to be incorporated is not in doubt.

*Regard*, 670 S.W.3d at 914 (citing *McDowell v. Hall*, 5 Ky. 610, 611 (Ky. 1812); *Dillingham v. Estill*, 33 Ky. 21, 22 (Ky. 1835)).

To summarize, Kentucky law draws a distinction between the sufficiency of language "*of incorporation*," and the adequacy of the reference to the document "*being incorporated*."  The language "*of incorporation,*" is afforded greater flexibility, and courts can conclude that the parties intended to incorporate another document by reference to the surrounding circumstances. Yet, to even reach that question, the identity of the document *being incorporated* must not be in doubt.  This is the fatal flaw to Commonwealth's argument.

Commonwealth states that Johnson entered into an arbitration agreement when he signed the Conversion Card, which sought to incorporate by reference the 2020 Member Service Agreement. [R. 9-1 at 11-12.]  Neither party disputes that this was a misnomer; rather than referencing that the document to be incorporated as the "Member Service Agreement," the Conversion Card stated that, by endorsing it, the signatory "received and agree[s] to the additional terms and conditions stated in the Membership and Account Agreement." [*See* R. 30 at 7.] ("Commonwealth does not contest that the 2021 Signature Card contains a minor error."). Commonwealth dismisses the significance of the misnomer, labeling it a mere "scrivener's error." [*Id*. at 4.]  Rather, Commonwealth contends that "even where the language purporting to incorporate additional terms is not perfectly precise, the terms are nonetheless incorporated if, based on the surrounding circumstances, it is clear that the parties knowingly assented to the incorporation of certain terms or documents." [*Id*. at 5-6.]  Relying on *Regard*, Commonwealth posits that Johnson "is attempting to increase the burden of demonstrating incorporation by

7

reference beyond that imposed by Kentucky law – looking for the perfectly formulated phrase of incorporation and wholly ignoring the glaringly obvious circumstances." [*Id*. at 7.]

Here, the Conversion Card cannot incorporate by reference the 2020 Member Service Agreement because, as a result of the misnomer, the identity of the document to actually be incorporated is in doubt.  There is certainly no doubt that Commonwealth intended to incorporate by reference several documents, including the 2020 Member Service Agreement, by stating expressly that the listed documents "are incorporated by reference into this Disclosure."  Thus, there is no question that the language "*of incorporation*," is sufficient to conclude that Commonwealth intended some documents to be incorporated.  The Court cannot, however, correct the mistaken identification of the 2020 Member Service Agreement by examining the surrounding circumstances.  The Court in *Regard* clearly stated that such considerations are reached only if "the document to be incorporated is not in doubt." *Regard*, 670 S.W.3d at 914.  Put simply, due to Commonwealth's misidentification, the document to be incorporated is squarely in doubt.  The signed document purports to incorporate a document which simply does not exist.  Although hindsight sheds light on the fact that the provision was a misprint, and Commonwealth intended to incorporate the 2020 Member Service Agreement, that does not alter the fact that the Conversion Card purported to incorporate a non-existent document.

Commonwealth's reliance on *Regard*, therefore, is ultimately misplaced  At its core, the central issue in *Regard* required the Court to determine whether two separate documents, presented alongside one another and containing overlapping material, were intended to be incorporated by reference. *Regard*, 670 S.W.3d at 909-10.  One document, signed by the plaintiff, was the "Student Financial Obligation," and the other was an accompanying bulletin, which provided additional terms and information, such as the tuition and mandatory fees, which varied according to whether the student enrolled in any in-person courses. *Id*.  The plaintiff, a

University of Kentucky student, contended that the signed Obligation should incorporate by reference the terms of the accompanying bulletin, and together form a valid, enforceable contract between the student and the University. *Id*. at 916-17.

Unlike here, there was no mystery as to the true identity of the second, unsigned document in *Regard*.  It was the bulletin, which was provided to students during the registration process. *Id*. at 917.  The Court first concluded that both parties had access to the document to be incorporated, meaning that "the identity of the document to be incorporated was not in doubt." *Id*. ("The students allege, and the University concedes, that the [document to be incorporated] was provided to them…").  The Court next determined that, despite the lack of clear language "of incorporation," the totality of the circumstances suggested that the second document should be incorporated by reference. *Id*. at 917-18.  In other words, *Regard* involves a dispute over the sufficiency of language "of incorporation," or lack thereof, rather than the adequacy of reference to the document "being incorporated."  And such a distinction is critical to the proper analysis under Kentucky law.

The issue here is essentially the reverse of that in *Regard*.  In *Regard*, the identity of the signed agreement between the Parties, and the document the Plaintiff sought to incorporate by reference, were not in dispute.  There, the Defendant's argument was that in the absence of a clear statement that the signed agreement intended to incorporate the terms of the unsigned bulletin, there could be no incorporation by reference.  Here, on the other hand, it is clear that the signed agreement, the Conversion Card, intended to incorporate several documents by reference. The dispute, however, centers on the fact that the identity of the document to be incorporated is unclear.  The law permits reference to circumstantial evidence to resolve the kind of dispute at issue in *Regard*, but it does not in the kind of dispute presently before the Court.

9

Commonwealth further asserts that "Plaintiff clearly had knowledge of and assented to the incorporation of the 2020 Member Service Agreement – as evidenced by the fact that he signed a document stating that he received a copy of and agreed to be bound by the terms and conditions of the membership agreement being incorporated therein." [R. 30 at 8.]  This argument points to the first prong of the incorporation analysis – which requires that the party to be bound "had knowledge of and assented to," the terms of the document to be incorporated. Commonwealth effectively states that, despite the misidentification on the Conversion Card, Johnson was on notice that the MSA could be modified and received actual notice of the 2020 modifications which added the arbitration clause.

Johnson disputes having ever received a copy of the 2020 Member Service Agreement. [R. 26-1.]  But even assuming, *arguendo*, that he was on notice that the Member Service Agreement had been amended to include an arbitration provision, that does not somehow cure Commonwealth's failure to correctly reference it in the Conversion Card.  The mere fact that Johnson was acutely aware of the contents of a third document has no bearing whatsoever when that is not actually the document referenced.  In other words, even if the person to be bound has detailed knowledge as to the contents of Document C, that has no bearing when the document he signs, Document A, explicitly purports to incorporate Document B.  In such a case, as far as the signatory is concerned, the document purportedly incorporated may be altogether different from the document he has received and is aware of, despite their somewhat similar titles.  At any rate, we need not reach the contested question of whether Johnson had knowledge of the 2020 Member Service Agreement, and its accompanying arbitration clause, because even if he was so aware the mislabeling in the Conversion Card's text proves fatal to Commonwealth's incorporation argument.

To summarize, the Conversion Card signed by Johnson contained a misprint, and purported to incorporate by reference a non-existent document. This fact alone prevents the actual document Commonwealth sought to incorporate, the 2020 Member Service Agreement, from being incorporated by reference. Even assuming Johnson was aware of the existence of the 2020 Member Service Agreement and its arbitration provision, that does not change the outcome where the signed document purports to incorporate an entirely different, non-existent document. Consequently, and as relevant here, although Johnson formed a contract with Commonwealth by endorsing the Conversion Card, that agreement did not contain the terms and conditions included within the 2020 Member Service Agreement, including its arbitration clause.

**B**

Since the 2020 Member Service Agreement cannot validly be incorporated by reference as it is presently written, the sole way by which incorporation could be effectuated would require this Court to reform the Conversion Card. Commonwealth suggests, albeit obliquely, that the Court should do so on the basis of a mutual mistake by the parties to the agreement. This argument likewise fails, however, because Commonwealth has not adequately demonstrated the existence of a mutual mistake.

"A Court has the power to reform a written agreement 'where, due to a mutual mistake by the parties, the instrument as drawn does not accurately express the true intention or agreement of the parties.'" *Pharm Corp. of Am. v. Premier Healthcare Mgmt., LLC*, 2019 U.S. Dist. LEXIS 205278, at *9 (W.D. Ky. Nov. 25, 2019) (quoting *Nichols v. Zurich Am. Ins. Co.*, 423 S.W.3d 698, 703 (Ky. 2014)). Before the Court can reform, however, "the party seeking reformation must prove, beyond a reasonable controversy by clear and convincing evidence, that the mistake was mutual and that the parties had actually agreed upon terms different from those expressed in the written instrument." *Id*. "A mutual mistake in respect to reformation is one in

11

which both parties participate, each laboring under the same misconception." *Karrick v. Wells*, 307 S.W.2d 929, 931 (Ky. 1957).

"[T]he mistake of a scrivener in drafting a document may be reformed based upon parol evidence." *Cadleway Properties, Inc. v. Bayview Loan Servicing, LLC*, 338 S.W.3d 280, 287 (Ky. Ct. App. 2010). "When one party maintains that there has been no mistake and that he has never expressed assent to any agreement other than the one stated in writing, the testimony and corroborating evidence of the party seeking reformation must be extremely strong in order to overcome the specific terms of the contract." *Spratt v. Carroll*, 399 S.W.2d 291, 293 (Ky. 1966). The Court "will not reform an executed instrument upon a mere preponderance of the proof …" *Ins. Co. of N. Am. v. Evans*, 17 S.W.2d 711, 712 (Ky. 1929). Put differently, "[w]here the evidence of mutual mistake in the preparation of a written contract is conflicting, and there is any doubt as to the right of reformation, it will be denied." *Hayes v. Hudson*, 273 S.W. 524, 525 (Ky. 1925). "The sanctity of contracts as written should not be lightly set aside." *Francis v. Domino*, 64 S.W.2d 571, 573 (Ky. 1933).

In essence, Commonwealth argues that because Johnson was aware of the existence of the 2020 MSA, he must have known he was assenting to the incorporation of the MSA instead of the nonexistent "Membership and Account Agreement." In support of this argument, Commonwealth has provided a sworn declaration of Blake Manning, a risk analyst at Commonwealth. [R. 30-3.] Manning provides that "[a]t no point during Plaintiff's membership did the Credit Union utilize a document formally titled the 'Membership and Account Agreement,'" and that "[a]ny reference to a "Membership and Account Agreement' in the Credit Union's forms refers to the version of the Member Service Agreement in effect at the time the document was signed[.]" [*Id.*] Further, he provides that "[w]hen the Credit Union decided to amend its Member Service Agreement to include the arbitration provision in October of 2020, it

subsequently sent notice of the amendment to its members, including Plaintiff." [*Id.*]  Lastly, as relevant here, Manning states that "[t]he Credit Union mailed notice of the amendment, along with instructions on how to access and review the revised Member Service Agreement, to the address Plaintiff listed on the 2019 Signature Card, which was the most recent address Plaintiff had provided to the credit union." [*Id.*]

Johnson disputes these facts.  In his own sworn affidavit, he stated that he was not sure what was meant by "Membership and Account Agreement," as it was written on the Conversion Card. [R. 26-1.]  He further states he "was also not given the 2020 MSA, but it does not have that title, either." [*Id.*]  He acknowledges that he was given a similar sheet with terms as part of the Member Service Agreement he signed in 2016, but observed that the title of that document did not match the document referenced in the Conversion Card. [*Id.*]  Lastly, he states that he "ha[s] never agreed to arbitration with Commonwealth." [*Id.*]

Commonwealth has failed to meet the extremely high burden of proof necessary to demonstrate the existence of a mutual mistake where, as here, one party insists that there has been no mistake.  Even assuming the information provided by Manning is true and accurate, that information merely speaks to whether Johnson had received a copy of the newest version of the Member Service Agreement, via mail, once those changes were finalized.  This, however, does not speak to whether Johnson subjectively believed that the Conversion Card actually referred to a different document, the Member Service Agreement.  Based on the information presented, it seems equally likely that Johnson believed that the Conversion Card was referencing some other document, which he had not received and was not otherwise aware of the arbitration provision. It would require a leap of logic for this Court to presume from the evidence presented that Johnson actually understood the mislabeled title to refer to the Member Service Agreement. Although the evidence strongly suggests that Johnson knew of the existence of the Member

13

Service Agreement, although not necessarily in its most updated (i.e., 2020) version, the evidence does not suggest he believed the Conversion Card contained a misprint.

At bottom, the evidence before the Court as to the existence of a mutual mistake is conflicting, and the Court harbors substantial doubt as to Commonwealth's right to reform the agreement. Again, this is an exceedingly high bar. Consequently, under Kentucky law, this Court must deny Commonwealth's efforts to engage in contract reformation.

### III

The facts presented on this motion should serve as a cautionary tale. A fundamental tenet of former Secretary of Defense Donald H. Rumsfeld's leadership of the Pentagon provides: "Be precise. A lack of precision is dangerous when the margin of error is small."[2] Such is the case here. Commonwealth's desire to address this dispute individually through arbitration, rather than class action litigation, could have been realized if only it had taken greater care to ensure precision in its drafting.

Furthermore, the Sixth Circuit has long recognized the risk of unequal bargaining power between commercial actors and consumers. See e.g., *State Farm Mut. Auto. Ins. Co. v. Norcold, Inc.*, 849 F.3d 328, 333 (6th Cir. 2017) ("Parties engaging in commercial transactions are generally sophisticated and have relatively equal bargaining power. Such parties engage in active negotiations that permit meaningful allocation of risk. Consumers, on the other hand, are usually less sophisticated – one cannot specialize in every product one purchases – and bargain with unequal power when negotiations actually do occur."). This is one such case where the often-asymmetrical nature of such negotiations is at the fore. Accordingly, and Court being otherwise sufficiently advised, it is hereby **ORDERED** as follows:

---

[2] *See* Jim Garamone, *Pentagon leaders brush up on 'Rumsfeld's Rules'*, Gov. Exec. (Jan. 25, 2001), https://www.govexec.com/federal-news/2001/01/pentagon-leaders-brush-up-on-rumsfelds-rules/8349/.

1.  The Defendant's Motion to Compel Arbitration and Stay Proceedings **[R. 9]** is

    **DENIED**;

2.  The Defendant shall file a responsive pleading within **thirty (30) days** of the entry of

    this Order.

This the 20th day of May 2026.

Gregory F. Van Tatenhove
United States District Judge