**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**LEXINGTON DIVISION**

| | |
|---|---|
| JARED JOHNSON, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>COMMONWEALTH FEDERAL CREDIT UNION,<br><br>Defendant. | Case No. 3:25-cv-42-GFVT |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT COMMONWEALTH FEDERAL CREDIT UNION'S MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION .................... 1

II. STATEMENT OF FACTS .................... 6

III. ARGUMENT .................... 7

A. Johnson Lacks Article III Standing Because He Alleges Neither a Concrete Injury Nor a Plausible Causal Connection to CCU. .................... 7

B. Plaintiff Fails to State a Claim. .................... 12

1. Count I Fails Because Johnson Does Not Plausibly Allege Breach, Causation, or Cognizable Injury. .................... 12

2. Count II Fails Because Johnson Does Not Identify a Valid Kentucky Negligence-Per-Se Predicate. .................... 15

3. Count III Fails Because Johnson Does Not Plead an Intentional, Highly Offensive Intrusion into Identified Private Information. .................... 16

4. Count IV Fails Because Johnson Does Not Plead an Enforceable Promise, Breach, or Resulting Contract Loss. .................... 18

5. Count V Fails Because Johnson Does Not Allege a Benefit He Directly Conferred on CCU. .................... 21

6. Count VI Fails Because Johnson Did Not Deliver Property to CCU for Safekeeping and Return. .................... 22

7. Count VII Fails Because Johnson Does Not Allege an Ascertainable KCPA Loss Caused by the Challenged Practice .................... 23

8. Counts VIII Through X Fail Because the Alleged Communications Were Directed to a Consenting Party and Each Count Omits Facts Necessary to Establish the Statutory Elements. .................... 24

a. The Same Party-and-Consent Exception and Premise Defeats All Three ECPA Counts .................... 24

b. The Federal Wiretapping Claims All Fail Because Johnson Does Not Identify Protected Contents or a Contemporaneous Acquisition. .................... 26

c. Count IX Independently Fails Because CCU Is Not a Public Electronic Communication Service Provider and No Contents Were Divulged While in Transmission .................... 29

d. Count X Independently Fails Because CCU Is Not a Public Electronic Communication Service Provider and No Contents Were Held in Electronic Storage. ... 31

9. Count XI Fails Because No Computational Gate Was Bypassed and No Qualifying CFAA Loss Is Alleged. ... 32

10. Count XII Fails Because Johnson Alleges Only Electronic Website Activity and CCU Was a Consenting Party. ... 33

IV. CONCLUSION ... 34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abu v. Dickson*,
107 F.4th 508 (6th Cir. 2024) ....................32

*Arndt v. Gov't Emps. Ins. Co.*,
750 F. Supp. 3d 518 (D. Md. 2024) ....................5

*In re Arthur J. Gallagher Data Breach Litigation*,
631 F. Supp. 3d 573 (N.D. Ill. 2022) ....................11

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....................11, 12

*Barnett v. Mercy Health Partners-Lourdes, Inc.*,
233 S.W.3d 723 (Ky. App. 2007) ....................18

*Baysal v. Midvale Indemnity Co.*,
78 F.4th 976 (7th Cir. 2023) ....................11

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ....................12

*Bowens v. Aftermath Entertainment*,
254 F. Supp. 2d 629 (E.D. Mich. 2003) ....................25

*In re BPS Direct, LLC*,
175 F.4th 423 (3d Cir. 2026) ....................8

*Caro v. Weintraub*,
618 F.3d 94 (2d Cir. 2010) ....................25

*Christensen v. ATS, Inc.*,
24 F. Supp. 3d 610 (E.D. Ky. 2014) ....................16

*Cobbs v. PetMed Express, Inc.*,
No. 25-8045-CIV, 2026 WL 905375 (S.D. Fla. Jan. 14, 2026) ....................17, 18

*Commonwealth of Kentucky v. Marathon Petroleum Co., LP*,
191 F. Supp. 3d 694 (W.D. Ky. 2016) ....................21

*Cook v. GameStop, Inc.*,
689 F. Supp. 3d 58 (W.D. Pa. 2023), *aff'd as modified*, 148 F.4th 153 (3d Cir. 2025) ....................4, 8, 27

*Craighead v. E.F. Hutton & Co.*,
899 F.2d 485 (6th Cir. 1990) ....................12

*Crowley v. CyberSource Corp.*,
166 F. Supp. 2d 1263 (N.D. Cal. 2001) ....................29, 30

*In re DoubleClick Inc. Privacy Litigation*,
154 F. Supp. 2d 497 (S.D.N.Y. 2001) ....................31

*Dyer v. Northwest Airlines Corp.*,
334 F. Supp. 2d 1196 (D.N.D. 2004) ....................19, 29, 30

*Farst v. AutoZone, Inc.*,
700 F. Supp. 3d 222 (M.D. Pa. 2023) ....................17

*Foster v. United States*,
728 F. Supp. 3d 473 (E.D. Ky. 2024) ....................13

*Galaria v. Nationwide Mutual Insurance Co.*,
No. 2:13-CV-118, 2017 WL 4918634 (S.D. Ohio Oct. 31, 2017) ....................22

*Gleason v. Magna Wave, Inc.*,
727 S.W.3d 714 (Ky. App. 2025) ....................33

*In re Google Inc. Cookie Placement Consumer Privacy Litigation*,
806 F.3d 125 (3d Cir. 2015) .................... *passim*

*Hargis v. Baize*,
168 S.W.3d 36 (Ky. 2005) ....................16

*Holland v. United Services Automobile Association*,
707 S.W.3d 541 (Ky. App. 2025) ....................23

*Jacome v. Spirit Airlines Inc.*,
No. 2021-000947-CA-01, 2021 WL 3087860 (Fla. Cir. Ct. June 17, 2021) ....................5

*James v. Meow Media, Inc.*,
300 F.3d 683 (6th Cir. 2002) ....................13

*In re JetBlue Airways Corp. Privacy Litigation*,
379 F. Supp. 2d 299 (E.D.N.Y. 2005) ....................29, 30

*Jones v. Hanna*,
814 S.W.2d 287 (Ky. App. 1991) ....................22

*Jones v. Sparks*,
297 S.W.3d 73 (Ky. App. 2009) ....................21

*Kurowski v. Rush Sys. for Health*,
683 F. Supp. 3d 836 (N.D. Ill. 2023) ....................5

*Ledford v. UofL Health-Louisville, Inc.*,
720 S.W.3d 594 (Ky. App. 2025) ....................17

*Luis v. Zang*,
833 F.3d 619 (6th Cir. 2016) ....................27, 28

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ....................7

*Martinez v. Mentavi, Inc.*,
2025 WL 3780427 (W.D. Mich. Oct. 9, 2025) ....................4, 25

*McCall v. Courier-Journal & Louisville Times Co.*,
623 S.W.2d 882 (Ky. 1981) ....................16

*McGee v. S-L Snacks National*,
982 F.3d 700 (9th Cir. 2020) ....................12

*McKenzie v. Allconnect, Inc.*,
369 F. Supp. 3d 810 (E.D. Ky. 2019) .................... *passim*

*Mikulsky v. Bloomingdale's, LLC*,
713 F. Supp. 3d 833 (S.D. Cal. 2024) ....................17

*Murphy v. Thomas Jefferson University Hospitals, Inc.*,
No. 22-4674, 2023 WL 7017734 (E.D. Pa. Oct. 10, 2023) ....................27

*Neinaber, et al v. Overlake Hospital Med. Ctr.*,
733 F.Supp.3d 1072 (W.D. Wash. May 13, 2024) ....................4

*In re Nickelodeon Consumer Privacy Litigation*,
827 F.3d 262 (3d Cir. 2016) ....................17

*Pathways, Inc. v. Hammons*,
113 S.W.3d 85 (Ky. 2003) ....................12

*Patton v. Bickford*,
529 S.W.3d 717 (Ky. 2016) ....................14, 15

*Popa v. Harriet Carter Gifts, Inc.*,
426 F. Supp. 3d 108 (W.D. Pa. 2019) ....................18

*Remijas v. Neiman Marcus Group, LLC*,
794 F.3d 688 (7th Cir. 2015) ....................11

*Rodriguez v. Google LLC*,
No. 20-CV-04688-RS, 2022 WL 214552 (N.D. Cal. Jan. 25, 2022) ....................28

*Sadler v. Advanced Bionics, Inc.*,
929 F. Supp. 2d 670 (W.D. Ky. 2013) ....................13

*Salazar v. Paramount Global*,
133 F.4th 642 (6th Cir. 2025) .......................................................................................7, 9

*Silha v. ACT, Inc.*,
807 F.3d 169 (7th Cir. 2015) .........................................................................................12

*Simon v. Eastern Kentucky Welfare Rights Organization*,
426 U.S. 26 (1976)..........................................................................................................10

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016).....................................................................................................7, 12

*Springer v. Cleveland Clinic Employee Health Plan Total Care*,
900 F.3d 284 (6th Cir. 2018) .........................................................................................11

*Stevens v. TD Bank, N.A.*,
2025 WL 1779164 (2025)...............................................................................................13

*Stuart v. Kyocera AVX Components Corp.*,
769 F. Supp. 3d 476 (D.S.C. 2025)................................................................................12

*Superior Steel, Inc. v. Ascent at Roebling's Bridge, LLC*,
540 S.W.3d 770 (Ky. 2017) ...........................................................................................21

*T & M Jewelry, Inc. v. Hicks ex rel. Hicks*,
189 S.W.3d 526 (Ky. 2006) ...........................................................................................16

*Tapply v. Whirlpool Corp.*,
148 F.4th 407 (6th Cir. 2025) .........................................................................................11

*Texas Capital Bank, N.A. v. First American Title Insurance Co.*,
822 F. Supp. 2d 678 (W.D. Ky. 2011) ...........................................................................22

*In re TikTok, Inc. In-App Browser Privacy Litigation*,
No. 24 C 2110, 2024 WL 4367849 (N.D. Ill. Oct. 1, 2024) .........................................27

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021).................................................................................................7, 10, 12

*United States v. Spence*,
No. 1:07-CR-146, 2008 WL 11417828 (E.D. Tenn. Apr. 22, 2008)..............................34

*University of Kentucky v. Regard*,
670 S.W.3d 903 (Ky. 2023) ...........................................................................................18

*Van Buren v. United States*,
593 U.S. 374 (2021)........................................................................................................32

*Vasil v. Kiip, Inc.*,
No. 16-CV-09937, 2018 WL 1156328 (N.D. Ill. Mar. 5, 2018).....................................27

*Yoon v. Lululemon USA, Inc.*,
549 F. Supp. 3d 1073 (C.D. Cal. 2021) ....................5, 27

*In re Zynga Privacy Litigation*,
750 F.3d 1098 (9th Cir. 2014) ....................26

**Statutes**

18 U.S.C. § 1030(c)(4)(A)(i) ....................32

18 U.S.C. § 1030(e)(8)....................32

18 U.S.C. § 1030(e)(11)....................32

18 U.S.C. § 1030(g) ....................32

18 U.S.C. § 2510(4) ....................26

18 U.S.C. § 2510(8) ....................26

18 U.S.C. § 2510(15) ....................29

18 U.S.C. § 2510(17) ....................31

18 U.S.C. § 2511(1) ....................26

18 U.S.C. § 2511(2)(d) ....................3, 24, 28

18 U.S.C. § 2511(3) ....................3

18 U.S.C. § 2511(3)(a)....................25, 29, 30

18 U.S.C. § 2511(3)(b)(ii)....................25

18 U.S.C. § 2702(a)(1)....................31

18 U.S.C. § 2702(b)(1) ....................25

18 U.S.C. § 2702(b)(3) ....................25

KRS § 365.732....................16

KRS § 367.170....................23

KRS § 367.220(1) ....................23

KRS § 446.070....................15, 16

KRS § 526.010....................33, 34

KRS § 526.020....................33

**Court Rules**

Fed. R. Civ. P. 12(b)(1)....................5, 12, 34

Fed. R. Civ. P. 12(b)(6)....................5, 12, 34

# I. INTRODUCTION

Plaintiff Jared Johnson's class-action Complaint is another in the growing wave of lawsuits seeking to impose extraordinary liability based on the alleged use of commonplace third-party analytics tools on public-facing websites. Here, Johnson attempts to transform Commonwealth Federal Credit Union's ("CCU") alleged use of Google-related tracking technology on its public Website into twelve causes of action for wiretapping, stored-communications violations, computer intrusion, invasion of privacy, negligence, breach of contract, unjust enrichment, bailment, and violations of Kentucky law. But the number of claims cannot compensate for the absence of facts supporting them.

All of Plaintiff's claims arise from the same, very limited, allegation that a "Tracker" allegedly collected "page views, button clicks, and scrolls." Compl. ¶ 42. After this, however, the Complaint is replete with non-specific generalities about tracking technologies, not Plaintiff-specific facts. Moreover, while it talks generally about Plaintiff Johnson's interactions with CCU as a financial institution (mentioning Johnson's loan applications, banking activity, etc.), it does not plead with specificity the substance of *any of this* that was sent to a third party; how many advertisements Johnson encountered were caused by information obtained from CCU; or that his Website usage and the Trackers were in any way connected to alleged unauthorized access to Johnson's checking account. *See id.* ¶¶ 4-5, 31-50, 84, 91-95. The Complaint alleges the beginning and announces the conclusion. It does not plead the facts connecting the two. What the Complaint does not allege factually is therefore most telling:

- The Complaint does not identify any particular information Johnson entered, viewed, or submitted that any particular tracker captured or transmitted. It does not identify a completed application answer, account balance, transaction detail, driver's-license image, payment-card number, or other confidential financial content belonging to Johnson that was sent to Google.

- The Complaint does not allege that CCU transmitted Johnson's password, authentication code, security answer, full account number, or any other credential that could permit access to his checking account.

- The Complaint does not allege that Johnson was logged into a Google account during a tracked interaction, that any Google or other third-party identifier accompanied a CCU website event, or that Google actually matched any information received from CCU to Johnson's identity. It relies instead on generalized allegations about what Google's technology is allegedly capable of doing.

- The Complaint does not identify any advertiser, data broker, social media platform, or other downstream recipient that actually received Johnson's information. Nor does it identify a single advertisement that contained, reflected, or was selected because of information Johnson communicated to CCU.

- The Complaint does not allege who supposedly accessed Johnson's checking account, when the access occurred, how the account was accessed, what information was viewed, what action was taken, or whether any transaction resulted. It does not allege that Google, Facebook, an advertiser, a data broker, or any other recipient accessed the account.

Indeed, the Complaint throws in almost as an afterthought the allegation about unauthorized access to his account without any supporting allegations of a data breach, system intrusion, data exfiltration, credential theft, phishing event, fraudulent transaction, unreimbursed charge, account closure, credit impairment, or any other event explaining how analytics reporting page views, clicks, and scrolls could have enabled access to a protected financial account. *See id.* ¶¶ 42, 84, 95. Without more, this unsubstantiated allegation is of no significance and simply does not causally align with the rest of the allegations in the Complaint.

At its center, the Complaint asks this Court to conflate capabilities with actualities—which it cannot do. And the Court should not be fooled when the Complaint substitutes descriptions of what tracking technologies can collect for *actual allegations* of any sensitive information was actually collected from Johnson. Or when the Complaint substitutes Google's theoretical ability to correlate data for an *actual allegation* that Google actually identified him. Plaintiff's reliance on generalities and omission of essential factual allegations serves to defeat every claim he brings.

*First*, Johnson lacks Article III standing because he does not plausibly allege either a concrete injury or a causal connection to CCU. The Complaint never identifies an actual transmission of Johnson's confidential information to a recipient that identified or used it. Targeted advertisements do not establish that Google received confidential information from CCU or that any advertisement resulted from a CCU transmission. The unexplained reference to unauthorized account access does not bridge the gap from analytics reporting page views, clicks, and scrolls to entry into a protected checking account. CCU's alleged marketing benefit is a claimed gain to CCU, not a loss to Johnson; statutory damages are a requested remedy, not an injury; and Johnson alleges no fraudulent transaction, out-of-pocket expense, lost account funds, impaired credit, or actual misuse of identified information attributable to the challenged tracking.

*Second*, all three ECPA counts fail at the threshold because every alleged communication was directed either to CCU through CCU's own website or, under Johnson's technical theory, directly from his browser to the third-party server designated to receive it. The provisions use different language, but each protects communications from outsiders—not from a party, intended recipient, or authorized agent. Count VIII is barred by the Wiretap Act's party-consent rule, 18 U.S.C. § 2511(2)(d); Count IX does not identify contents divulged by a public electronic communication service while in transmission and disregards the recipient-and-agent limitations in § 2511(3); and Count X does not identify contents held in statutory electronic storage by such a service and disregards the SCA's recipient, agent, and consent exceptions. The Complaint also fails to identify the contents of a particular communication, contemporaneous acquisition of those contents, a public electronic communication service supplied by CCU, or statutory electronic storage.

*Third*, the common-law and Kentucky consumer claims fail because the Complaint does not plead the conduct, breach, causation, or damages required by those claims. The negligence and

contract theories depend on an actual disclosure of protected information and resulting injury, not the mere presence of analytics code. The intrusion claim requires an intentional and highly offensive examination of Johnson's private affairs, not an assumption that a tracker reporting website events must have captured confidential account content. Unjust enrichment requires a benefit conferred by Johnson and inequitably retained by CCU; bailment requires property delivered for safekeeping and return; and the Kentucky Consumer Protection Act requires an ascertainable loss of money or property caused by the challenged conduct. The Complaint's generalized labels do not satisfy those distinct requirements.

*Fourth*, the remaining federal and Kentucky statutory claims are inapplicable and insufficiently pled. The Computer Fraud and Abuse Act requires access through a computational gate and a qualifying statutory loss; Johnson alleges neither. Kentucky's eavesdropping statute covers wire or oral communications, not the electronic website activity alleged here, and in any event, has a single-party consent exception that applies here.

*Finally*, courts around the country, including those analyzing the ECPA, have routinely dismissed similar cases, and this Court should follow form. *See, e.g.*, *Martinez v. Mentavi, Inc.*, 2025 WL 3780427 (W.D. Mich. Oct. 9, 2025) (dismissing ECPA claim despite allegations that tracking tools captured and transmitted users' PHI and PII because the website operator was a party to the communications); *Neinaber, et al v. Overlake Hospital Med. Ctr.*, 733 F.Supp.3d 1072 (W.D. Wash. May 13, 2024) (dismissing ECPA claims arising from website tracking because the defendant was a party to the plaintiff's website communications and therefore fell within the statute's one-party consent exception; highlighting the lack of sufficient damages pled and the voluntary nature of plaintiff's conduct as barring plaintiff's claims); *Cook v. GameStop, Inc.*, 689 F. Supp. 3d 58, 61 (W.D. Pa. 2023), *aff'd as modified*, 148 F.4th 153 (3d Cir. 2025) (dismissing Pennsylvania Wiretap Act claim where the alleged mouse movements, clicks, URLs, and

unspecified keystrokes did not plausibly constitute the "contents" of communications, and looking to ECPA precedent because the relevant statutory definitions are identical); *Arndt v. Gov't Emps. Ins. Co.*, 750 F. Supp. 3d 518, 528 (D. Md. 2024) (dismissing pixel tracking lawsuit for lack of concrete injury based on defendant's alleged collection of mere website activity, such as mouse movements, keystrokes and clicks, search terms, or content viewed by plaintiff on defendant's website because "[s]uch information does not convey any personal, private, or identifying information" and this information is "comparable to that which would reflect 'public shopping behavior in the real world'"); *Jacome v. Spirit Airlines Inc.*, No. 2021-000947-CA-01, 2021 WL 3087860, at *1 (Fla. Cir. Ct. June 17, 2021) (concluding that plaintiff failed to state a claim under Florida's wiretap statute because session replay software does not constitute an "electronic, mechanical, or other device" within the meaning of the statute); *Kurowski v. Rush Sys. for Health*, 683 F. Supp. 3d 836, 844 (N.D. Ill. 2023) (dismissing healthcare website-tracking ECPA claim because the defendant was a party to the communications and the plaintiff failed to allege either the disclosure of specific individually identifiable health information or any criminal or tortious purpose independent of the alleged interception itself; stating that, "[t]he type of metadata that [plaintiff] alleges was transmitted via third-party source code does not in the least bit fit into [the PHI] category."); *Yoon v. Lululemon USA, Inc.*, 549 F. Supp. 3d 1073, 1082 (C.D. Cal. 2021) (plaintiff failed to state a claim under California Invasion of Privacy Act because keystrokes, mouse clicks, pages viewed, and shipping and billing information are not contents of a communication).

Capability is not conduct. Possibility is not fact. And a chain of possibilities is not plausibility. The Complaint should be dismissed under Rules 12(b)(1) and 12(b)(6).

## II. STATEMENT OF FACTS

CCU is a Kentucky credit union that provides financial services through a public-facing website, online banking portal, mobile application, and other digital services. Compl. ¶¶ 2, 16-20, 25-27. Johnson alleges that he maintained an account with CCU and used CCU's online platforms to apply for a loan, pay bills, check an account balance, and obtain other financial services. *Id.* ¶¶ 16, 82-83. He alleges generally that he entered information he characterizes as "Personal and Financial Information" while doing so. *Id.* ¶ 83.

The Complaint alleges that CCU embedded third-party tracking code, including Google tools, on its website. *Id.* ¶¶ 1, 3-5, 31-42. The vast majority of the 60-page Complaint discusses trackers generally and alleges what such technology may be capable of collecting or allowing a website operator or third party to learn. *Id.* ¶¶ 31-39. Actual CCU-specific allegations are much more limited and boil down to allegations that CCU's Website allegedly reported "page views, button clicks, and scrolls." *Id.* ¶¶ 40-42.

The Complaint does not identify which CCU page Johnson was using when any tracker allegedly captured his information, whether Johnson was in the customer portal when such capture allegedly occurred, which tracker was present, what Johnson entered or viewed, what data field was transmitted, when the transmission occurred, or what recipient received it. It does not allege that the identified Google Analytics tracker captured the substance of an application, an account transaction, or any specified confidential communication belonging to Johnson. And it does not distinguish among CCU's public Website, authenticated banking portal, application pages, and mobile application, instead treating those different services and technologies as though the presence of tracking code somewhere on CCU's online platforms necessarily meant that everything Johnson entered or accessed was captured and transmitted.

Similarly, the Complaint does not allege that Google actually identified Johnson from any CCU Website event. It does not identify an account identifier, cookie, email address, or other information accompanying a particular transmission that linked the event to him. Nor does it identify any advertiser, data broker, social media platform, or other downstream party that received Johnson's information, any advertisement attributable to a CCU transmission, or any use of his information by such a recipient. Finally, the Complaint does not allege any actual harm suffered by Johnson caused by the alleged tracking.

## III. <u>ARGUMENT</u>

### A. Johnson Lacks Article III Standing Because He Alleges Neither a Concrete Injury Nor a Plausible Causal Connection to CCU.

Johnson bears the burden of establishing standing for each claim and each form of relief. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *TransUnion LLC v. Ramirez,* 594 U.S. 413, 431 (2021). He therefore must plausibly allege a concrete and particularized injury that is fairly traceable to CCU's challenged conduct. A statutory violation, without resulting concrete harm, is not enough. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016). Nor may Johnson rely on generalized allegations concerning other customers, hypothetical downstream uses, or injuries that unidentified class members might have suffered. *See TransUnion*, 594 U.S. at 431.

The Complaint lists numerous alleged injuries, but labels are not facts. See Compl. ¶ 95. Some are not concrete. Others are not plausibly traceable to CCU. None establishes Johnson's standing.

*First*, Johnson does not allege the actual privacy invasion on which his case depends. An actual disclosure of private information or intrusion into private affairs may constitute a concrete intangible injury, but only where the claim is analogous to a historical privacy tort. *TransUnion*, 594 U.S. at 424-27; *Salazar v. Paramount Global*, 133 F.4th 642, 649-54 (6th Cir. 2025). Calling an event a privacy invasion does not establish that the event occurred. Johnson must still allege

facts showing that his private information was actually captured, examined, or disclosed. He does not.

The only tracker output the Complaint identifies with factual specificity is "page views, button clicks, and scrolls." Compl. ¶ 42. Elsewhere, it recites an omnibus list of allegedly disclosed categories—including "application details," "identification information," and "membership status"—without identifying which item belonging to Johnson was captured, which tracker captured it, what transmission carried it, or who received it. *Id.* ¶¶ 4, 83, 91-93. Those labels are vague and ambiguous. Terms like "application details," "Identification information" and "Membership Status" without more, are inconsequential for the purposes of establishing standing because they could mean just about anything. "Application details," could mean the title of a webpage or Johnson's answers concerning income and credit needs or something else altogether. "Identification information" is so broad as to be meaningless, as is "Membership status." Plaintiff must plead more than undefined terms.

The distinction is concrete, not semantic. In *Cook v. GameStop, Inc.*, the capture of nonidentifying website interactions did not create a concrete privacy injury where the plaintiff did not allege that the data included her name, contact information, address, or billing information. 148 F.4th 153, 165-69 (3d Cir. 2025). In *In re BPS Direct, LLC*, routine clicks, scrolls, searches, and browsing activity were insufficient where the information was not sensitive, was not linked to the plaintiffs, and the technology's alleged de-anonymization capability was not actually used. 175 F.4th 423, 428-33 (3d Cir. 2026). Moreover, the court distinguished plaintiffs who alleged that the technology surreptitiously captured their complete credit or debit card numbers from those who did not. *Id.* What matters is not that sensitive information existed somewhere on the website, but whether the tracker *actually obtained sensitive information belonging to this plaintiff*.

*Salazar* makes the same point from the opposite direction. There, the complaint identified a discrete disclosure: the defendant allegedly sent the plaintiff's private video-viewing history to Facebook together with his Facebook ID. 133 F.4th at 649-54. The information disclosed, the identifier connecting it to the plaintiff, the recipient, and the transmission were all alleged. Here, Johnson does not identify a particular financial communication, an identifier linking it to him, or a recipient that actually associated the two. The allegation that Google possesses technology capable of identifying users does not allege that Google identified Johnson from a CCU website event. Possible future identification is not a present privacy injury.

*Second*, the injuries that sound most concrete are not plausibly traceable to CCU. The most serious allegation—"unauthorized access" to Johnson's checking account—is also the least developed. Compl. ¶ 95(b). The Complaint does not identify who accessed the account, when the access occurred, how the person gained entry, what information was viewed, what action was taken, or whether any transaction or financial loss resulted. More importantly, it does not allege that CCU transmitted Johnson's password, authentication code, security answer, full account number, or any other credential capable of permitting access. Nor does it allege that Google, any Google customer, an advertiser, a data broker, or any other recipient of tracker information entered his account.

The Complaint instead asks the Court to infer that analytics reporting "page views, button clicks, and scrolls" somehow supplied an unknown actor with the means to enter a protected checking account. Compl. ¶ 42. If that extraordinary chain of events had occurred, it must be bolstered by at least some allegation of a compromised credential, security alert, fraudulent transaction, attempted transfer, unreimbursed charge, or other indication of a security incident. The Complaint alleges none. It places "website tracking" at one end of the theory and "unauthorized account access" at the other, leaving the Court to invent everything in between. That

is not fair traceability. See *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 41-42 (1976).

The targeted-advertising allegation fares no better to establish standing. Johnson alleges only that, after using CCU's online services, he "regularly received targeted advertising on his social media accounts" for banking products and loans. Compl. ¶ 84. He does not identify a particular advertisement, the entity that served it, when it appeared, what information it reflected, or any feature suggesting that it resulted from a communication with CCU. Receiving advertisements for financial products after using a financial institution's website does not itself establish either injury or causation.

Chronology is not traceability. The Complaint's theory requires multiple unpled events between Johnson's interaction with the CCU Website and an advertisement: a tracker must capture a Johnson-specific communication; Google must identify Johnson from it; Google must retain, combine, or disclose the information; another platform or advertiser must receive and use it; and that use must produce the particular advertisement Johnson later sees. Compl. ¶¶ 43-50, 84. The Complaint describes each step *only as something that may occur*. It does not allege that any step actually occurred with Johnson's information, and it offers no facts distinguishing its theory from obvious alternative explanations such as Johnson's other internet searches, social-media activity, existing credit relationships, demographic targeting, or ordinary audience-based advertising. See *Simon*, 426 U.S. 26 at 41-42 (finding traceability lacking where it was "purely speculative" whether the alleged injury resulted from the challenged conduct or from independent decisions by third parties).

*Third*, Johnson's noneconomic "harms" do not constitute injury-in-fact. Worry or fear of possible future misuse is insufficient when the threatened harm has not materialized and the Complaint alleges no separate present injury caused by exposure to that risk. See *TransUnion*, 594

U.S. at 435-38; *Baysal v. Midvale Indemnity Co.*, 78 F.4th 976, 977-78 (7th Cir. 2023). Johnson also claims "embarrassment, humiliation, frustration, and emotional distress," Compl. ¶ 95(j), but alleges no facts describing that distress, its consequences, or the event that caused it. Even assuming adequately pleaded emotional distress could constitute concrete harm, the Court need not accept an unsupported injury label. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

*Fourth*, Johnson's economic theories identify no actual economic loss. The asserted loss in the "value" of his information does not identify money he lost or an opportunity of which he was deprived. In *Remijas v. Neiman Marcus Group, LLC,* the court declined to find standing based on the asserted loss of personal information as an intangible commodity because the plaintiffs identified no authority recognizing the necessary property right under federal law and alleged no facts suggesting that their information could be sold for value. 794 F.3d 688, 695 (7th Cir. 2015). Johnson likewise identifies neither authority recognizing a property right in the information allegedly transmitted nor facts showing that the information had a realizable market value. *In re Arthur J. Gallagher Data Breach Litigation* likewise rejected the proposition that personal information's abstract economic value, standing alone, establishes concrete harm. 631 F. Supp. 3d 573, 592 (N.D. Ill. 2022). Johnson does not allege that he licensed or attempted to sell the information, lost a sale, or was prevented from participating in an identifiable market.

The alleged lost benefit of the bargain fares no better. That theory may support standing when a plaintiff plausibly alleges that he was denied a specific contractual benefit or paid for a product or service worth less than promised. See *Springer v. Cleveland Clinic Employee Health Plan Total Care,* 900 F.3d 284 (6th Cir. 2018); *Tapply v. Whirlpool Corp.*, 148 F.4th 407 (6th Cir. 2025). Johnson identifies no fee paid for a tracking-free service, no price premium attributable to a privacy protection, no promised account benefit that CCU withheld, and no diminution in the value or functionality of the financial services he received. Compl. ¶¶ 194-97. Courts reject

benefit-of-the-bargain standing in the data-privacy context where the plaintiff does not plausibly allege that the purchased goods or services were worth less because of the challenged conduct. *See Stuart v. Kyocera AVX Components Corp.*, 769 F. Supp. 3d 476 (D.S.C. 2025); *McGee v. S-L Snacks National*, 982 F.3d 700 (9th Cir. 2020).

CCU's alleged revenues, marketing savings, or profits likewise cannot establish Johnson's standing because Article III asks what the plaintiff lost, not what the defendant gained. *Silha v. ACT, Inc.*, 807 F.3d 169, 175 (7th Cir. 2015). Statutory damages are a potential remedy, not a substitute for the concrete injury required to invoke federal jurisdiction. *TransUnion*, 594 U.S. at 426-27; *Spokeo*, 578 U.S. at 341.

*Finally*, none of these theories cures the same central defect fatal to this action in general: the Complaint does not identify an actual transmission of Johnson's confidential information, actual downstream use of that information, or a concrete consequence fairly traceable to CCU. Because Johnson has pleaded a chain of possibilities rather than a concrete injury and plausible causal connection, the Complaint should be dismissed under Rule 12(b)(1).

**B. Plaintiff Fails to State a Claim.**

Rule 12(b)(6) requires sufficient factual pleadings to state a facially plausible claim. *Iqbal*, 556 U.S. at 678; *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). The Court accepts well-pleaded facts and reasonable inferences, but not legal conclusions, formulaic elements, or allegations that stop at possibility rather than plausibility. *Iqbal*, 556 U.S. at 678-79. A claim fails when the pleaded facts do not support a required element. *Craighead v. E.F. Hutton & Co.*, 899 F.2d 485, 489 (6th Cir. 1990).

**1. Count I Fails Because Johnson Does Not Plausibly Allege Breach, Causation, or Cognizable Injury.**

Kentucky negligence requires duty, breach, causation, and injury. *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 88-89 (Ky. 2003). As a threshold matter, there should be no duty to

"protect" innocuous voluntary interactions with a public website. Regardless, the Court need not decide at this stage the full scope of any duty CCU may owe when handling customer information. Count I fails regardless because the Complaint does not plausibly allege any breach, how the alleged conduct caused Johnson's claimed harms, or a cognizable injury resulting from the alleged breach.

Even assuming CCU owed a duty to exercise reasonable care in handling sensitive customer information, that duty would not make every interaction with a Website actionable or render the use of analytics technology inherently negligent. Kentucky negligence law asks whether the defendant failed to exercise reasonable care under the circumstances and whether that breach caused a cognizable injury. *See James v. Meow Media, Inc.*, 300 F.3d 683, 689-90 (6th Cir. 2002); *Foster v. United States*, 728 F. Supp. 3d 473 (E.D. Ky. 2024). The Complaint therefore must allege facts showing sensitive information was actually transmitted, what act or omission made that transmission unreasonable, and how the alleged breach caused Johnson's injury. *See Stevens v. TD Bank, N.A.*, 2025 WL 1779164 (2025) (dismissing a website-tracking claim where the plaintiff alleged what the technology was capable of collecting but not what information it actually collected); *McKenzie v. Allconnect, Inc.*, 369 F. Supp. 3d 810 (E.D. Ky. 2019). General references to industry standards and a duty to safeguard data may inform the applicable standard of care, but they do not substitute for factual allegations establishing breach, causation, and injury. *See Sadler v. Advanced Bionics, Inc.*, 929 F. Supp. 2d 670 (W.D. Ky. 2013).

The Complaint tries to cast its negligence claim in data breach terms by invoking the familiar language of inadequate safeguards, deficient vendor oversight, and unauthorized disclosure. Compl. ¶¶ 153-59. But the facts alleged do not resemble the data breaches addressed in the cases on which that terminology is based. Johnson does not allege that a criminal penetrated CCU's systems, that CCU lost control of stored customer records, that unencrypted data was

exfiltrated, or that CCU failed to respond to a known security incident. He alleges instead that CCU placed analytics code on its own website and thereby transmitted information concerning page views, clicks, and scrolling activity to a service provider. *Id.* ¶ 42. Repeatedly characterizing that information as "Personal and Financial Information" does not transform the alleged transmission into the compromise of account credentials or other sensitive records. As an example, the contrast with *McKenzie v. Allconnect, Inc.* is instructive. There, an employee allegedly collected workers' W-2 information and affirmatively sent it to a phisher, producing an actual unauthorized disclosure of sensitive personal information and causing the plaintiffs to incur time and expense protecting themselves against misuse. 369 F. Supp. 3d 810, 814-20 (E.D. Ky. 2019). Data breach cases do not establish that analytics technology is inherently negligent; they instead underscore what is missing here: a concrete release of sensitive information, an unreasonable security failure, and resulting mitigation costs or other injury.

The breach-of-duty allegations are also too indefinite. The Complaint does not identify a particular data field CCU configured a tracker to collect, a vendor instruction that caused protected content to be sent, or a reasonable safeguard that would have prevented the alleged transmission while still permitting the service at issue. Nor does it allege that CCU sent credentials or information capable of granting access to Johnson's account. The Court can accept that CCU used Google tools without accepting the unsupported conclusion that the tools thereby received every item Johnson used on the website.

Causation is also unestablished. Kentucky requires a direct and identifiable nexus between the alleged breach and the injury. *See Patton v. Bickford*, 529 S.W.3d 717, 730-31 (Ky. 2016). The advertising theory depends on several unpled events: a tracker captured a particular Johnson communication; Google identified him; Google retained or combined the information; Google or another entity shared it; an advertiser used it; and the resulting ad appeared on Johnson's social-

media account. Compl. ¶¶ 43-50, 84. The account-access theory has an even larger gap because it requires an unidentified actor to obtain an unalleged credential through an unexplained route. A temporal allegation that ads or access occurred after use of CCU's website is not a plausible causal nexus.

Nor can the causation problem be answered simply by characterizing downstream misuse as foreseeable. Foreseeability does not dispense with cause in fact or Kentucky's requirement of a direct and identifiable nexus. *See Patton*, 529 S.W.3d at 730-31. Even if data received by an analytics provider could foreseeably influence advertising, Johnson still must allege that a CCU event identifying him reached, and was used by, the entity that selected an ad. And even if stolen credentials can foreseeably lead to account access, Johnson must allege that CCU's tracker captured or disclosed a credential. The presence of third parties is not categorically fatal; the absence of facts about what any of them received or did is.

The "injury" allegations also fail to establish damages as discussed above.. Johnson alleges no fraudulent charge, lost funds, identity theft, credit injury, or concrete mitigation expense. The data-breach plaintiffs in *McKenzie* alleged lost time and money responding to an actual release of W-2 information. 369 F. Supp. 3d at 817-18. Here, the Complaint lists emotional distress, lost privacy, data value, benefit of the bargain, and future risk without any factual content showing a present loss caused by CCU. Compl. ¶¶ 95, 160-64. Even if Kentucky recognizes some nonpecuniary harm after an actual privacy breach, the Complaint must first plausibly allege the breach and causal connection. It does not. Count I should be dismissed.

**2. Count II Fails Because Johnson Does Not Identify a Valid Kentucky Negligence-Per-Se Predicate.**

Kentucky's negligence-per-se doctrine is codified in KRS § 446.070. The statute creates a private right of action for the violation of a statute that is penal in nature and provides no civil remedy, provided the plaintiff belongs to the class of persons the statute was intended to protect.

*Hargis v. Baize*, 168 S.W.3d 36, 40 (Ky. 2005). The predicate statute must also have been intended to prevent the type of occurrence alleged, and its violation must have been a substantial factor in causing the plaintiff's injury. *Id.* at 45. For purposes of KRS § 446.070, however, "any statute" means a Kentucky statute; federal statutes and regulations cannot supply the predicate. *T & M Jewelry, Inc. v. Hicks ex rel. Hicks*, 189 S.W.3d 526, 529-30 (Ky. 2006); *Christensen v. ATS, Inc.*, 24 F. Supp. 3d 610, 613 (E.D. Ky. 2014).

Count II rests primarily on the FTC Act, the Gramm-Leach-Bliley Act, federal regulations, and unidentified industry standards. Compl. ¶¶ 167, 172. None is a Kentucky statutory predicate under KRS § 446.070. The count's residual reference to "state law" does not identify a statute, a violated provision, a protected class, or a covered injury. To the extent Plaintiff might rely on Kentucky's breach-notification statute, KRS § 365.732, the Complaint does not allege a statutory "breach of the security of the system," and the statute exempts financial institutions subject to Title V of the GLBA. KRS § 365.732. In all events, the same causation and injury defects remain. Because none of the statutes or regulations Plaintiff invokes can support negligence per se under Kentucky law, the Court need not examine them one by one. Count II should be dismissed.

**3. Count III Fails Because Johnson Does Not Plead an Intentional, Highly Offensive Intrusion into Identified Private Information.**

Kentucky follows the Restatement formulation of intrusion upon seclusion. The plaintiff must allege an intentional intrusion into a matter he had a right to keep private that would be highly offensive to a reasonable person. *McCall v. Courier-Journal & Louisville Times Co.*, 623 S.W.2d 882, 887 (Ky. 1981); *McKenzie*, 369 F. Supp. 3d at 819.

The Complaint's allegations do not meet that standard. It says CCU intentionally installed analytics tools, but the specific information attributed to the identified Google Analytics configuration is page views, button clicks, and scrolls. Compl. ¶ 42. It does not allege that the tracker captured Johnson's password, a full account or card number, the amount of his balance,

the substance of a payment instruction, or another identified private communication. Instead, Count III incorporates the collective assertion that all information characterized as "Personal and Financial Information" was captured and then recites that the conduct was intentional and highly offensive. *Id.* ¶¶ 177-90. Those conclusions do not identify the private matter into which CCU supposedly intruded.

Cases permitting privacy claims in Kentucky involved materially more concrete conduct. *Ledford v. UofL Health-Louisville, Inc.* addressed alleged unauthorized access to a patient's electronic medical records and emphasized that the actual intrusion into private records may itself be actionable. 720 S.W.3d 594, 605-09 (Ky. App. 2025). *McKenzie* involved an employee's affirmative collection and transmission of W-2 data to a phisher, coupled with allegations that the employer knew of phishing risks and acted in reckless disregard. 369 F. Supp. 3d at 819-20. Johnson does not allege comparable access to a protected record or transmission of an identified sensitive file.

Persuasive website-tracking cases likewise distinguish routine event data from an egregious intrusion into private affairs. *In re Nickelodeon Consumer Privacy Litigation* held that tracking through cookies and persistent identifiers, even on a child-directed site, was not sufficiently offensive to sustain an intrusion claim. 827 F.3d 262, 293-95 (3d Cir. 2016). *Farst v. AutoZone, Inc.* found that alleged capture of mouse clicks, keystrokes, search terms, page views, and scrolling on a public-facing website did not describe highly offensive conduct. 700 F. Supp. 3d 222, 231-33 (M.D. Pa. 2023). Those decisions show why Plaintiff must plead what private content was actually invaded. This Complaint does not.

Other cases apply the same limiting principle to commercial websites. *Mikulsky v. Bloomingdale's, LLC* held that browsing data collected on the defendant's own site did not support a privacy interest sufficient for intrusion. 713 F. Supp. 3d 833, 846 (S.D. Cal. 2024). *Cobbs v.*

*PetMed Express, Inc.* found alleged collection of pet-related information, keystrokes, links, and form entries insufficiently offensive absent a more substantial invasion. No. 25-8045-CIV, 2026 WL 905375, at *11 (S.D. Fla. Jan. 14, 2026). And *Popa v. Harriet Carter Gifts, Inc.* reached the same result even though the alleged data included a name, residential address, and email address. 426 F. Supp. 3d 108, 122-23 (W.D. Pa. 2019). Those persuasive decisions do not create a blanket rule for financial institutions, but they reinforce the need for facts showing what private financial content was actually captured in order for claims to move forward.

Count III does not identify an actual intrusion into Johnson's private financial content, and it should be dismissed.

**4. Count IV Fails Because Johnson Does Not Plead an Enforceable Promise, Breach, or Resulting Contract Loss.**

A Kentucky breach-of-contract claim requires a valid contract, breach, and damages caused by the breach. *Barnett v. Mercy Health Partners-Lourdes, Inc.*, 233 S.W.3d 723, 727 (Ky. App. 2007). Whether framed as express or implied, the claim must identify mutual assent to a sufficiently definite obligation. An implied-in-fact contract arises from conduct showing a tacit understanding, not from one party's uncommunicated expectation. *McKenzie*, 369 F. Supp. 3d at 820.

The express-contract theory begins with the assertion that CCU's contracts with its customers include its Privacy Notice and Terms and Conditions, which are "maintained" on its website. Compl. ¶ 54. But the Complaint does not allege that Johnson clicked to accept those documents, that they were presented as contractual terms when he opened or used his account, that he read or relied on them when undertaking a transaction, or that an account agreement incorporated them. A document can be incorporated into an online agreement when the parties objectively assent and the incorporated terms are adequately identified and provided. See *University of Kentucky v. Regard*, 670 S.W.3d 903, 910-14 (Ky. 2023). The bare fact that a policy

was posted or maintained on a website does not allege those circumstances. See *Dyer v. Northwest Airlines Corp.*, 334 F. Supp. 2d 1196, 1199-1200 (D.N.D. 2004) (dismissing a contract claim based on a website privacy policy because broad statements of company policy generally do not create contractual obligations, the plaintiffs did not allege that they accessed, read, understood, relied upon, or otherwise considered the policy, and they failed to allege contractual damages).

The Complaint also does not plausibly establish the specific promise Count IV asserts. CCU did not promise that no service provider would ever receive website interaction data. CCU's statement that it would maintain account confidentiality "in accordance with" its privacy policy points to the policy's terms; it does not amount to an unconditional promise that no service provider would ever receive website interaction data. Compl. ¶ 56. The mobile-banking provision addresses only what information CCU collects to perform a customer's requested transactions. It does not promise that website interaction data will never be transmitted to a service provider; the Complaint does not allege what unnecessary information the mobile app collected or connect that statement to the Google Analytics configuration on the banking portal. *Id.* ¶ 55. And the Privacy Notice statements about not sharing for specified affiliate or nonaffiliate marketing purposes do not, without more, promise that CCU will never use analytics or transmit non-content event data to a vendor. *Id.* ¶¶ 58-59.

The provisions also address different subjects. A statement about collecting information necessary for a requested mobile-banking transaction does not necessarily govern innocuous browser activity on the Website. And the Privacy Notice's statements about specified affiliate and nonaffiliate marketing practices do not amount to an unqualified promise that no vendor will receive any website event for analytics, security, or service operation. To plead breach, Johnson must connect an identified transmission to a definite term: for example, account information disclosed for a prohibited nonaffiliate marketing purpose. The Complaint instead moves from the

policy language to the conclusion that any alleged Google transmission violated every quoted promise.

Even if one of those statements were enforceable, the Complaint does not plausibly allege a breach thereof as to Johnson. It again relies on the collective list in paragraph 4 and the conclusion that Google and unidentified fourth parties used Johnson's information for marketing. It does not identify a particular Johnson communication sent for a prohibited marketing purpose, a nonaffiliate that marketed to him using that communication, or an item of account information disclosed contrary to a definite contractual term.

The implied-contract theory has the same problem. In *McKenzie*, employees alleged that they were required to provide W-2 information as a condition of employment, supporting an inference that the employer tacitly agreed to safeguard that specific information; they also alleged its actual release. 369 F. Supp. 3d at 820-21. The Complaint does not identify any specific implied terms of any contract with sufficient precision that would apply here. It conflates an expectation by Johnson that sensitive information would be protected as an agreement barring any third-party analytics on any page, regardless of the information transmitted. It does not allege facts showing that CCU manifested assent to that sweeping term.

Finally, the Complaint alleges no price premium, reduced account value, fee paid specifically for a promised tracking-free service, or other contract loss required to establish damages. The Complaint's "would have paid less" and lost-benefit allegations are hypothetical and unsupported by a transaction or amount. Compl. ¶¶ 194-97. Although alleging contract damages would not cure the more fundamental absence of formation and breach, this Complaint does not do so. Count IV should be dismissed.

**5. Count V Fails Because Johnson Does Not Allege a Benefit He Directly Conferred on CCU.**

Unjust enrichment requires a benefit conferred on the defendant at the plaintiff's expense, the defendant's appreciation of that benefit, and inequitable retention without payment for its value. *Jones v. Sparks*, 297 S.W.3d 73, 78 (Ky. App. 2009); *Superior Steel, Inc. v. Ascent at Roebling's Bridge, LLC*, 540 S.W.3d 770, 778 (Ky. 2017). The plaintiff must allege a benefit he directly conferred; it is not enough to say that the defendant benefited itself. *Commonwealth of Kentucky v. Marathon Petroleum Co., LP*, 191 F. Supp. 3d 694, 706 (W.D. Ky. 2016).

The requirement that the benefit be conferred at the plaintiff's expense prevents a restitution claim from becoming a general challenge to a defendant's profitable conduct. If CCU improved its website or marketing through a vendor's analytics service, that benefit could arise from CCU's own systems, expenditures, and vendor relationship; it is not necessarily value transferred from Johnson. Likewise, an allegation that Google or another entity values behavioral data does not identify a benefit retained by CCU. The Complaint must allege a concrete benefit that Johnson directly supplied and that equity requires CCU to restore to him. *Marathon*, 191 F. Supp. 3d at 706.

Count V alleges that Johnson's information had value and that CCU saved marketing costs or improved its campaigns. Compl. ¶¶ 199-206. It does not allege that Johnson sold or attempted to sell the information, that CCU sold his data, that any identified revenue resulted from it, or that a measurable portion of a fee he paid was exchanged for a tracking-free website. The allegation that data is generally valuable in modern advertising does not establish a direct benefit conferred by Johnson at his expense or an amount that equity requires CCU to return. Count V does not plead the elements of unjust enrichment and should be dismissed.

**6. Count VI Fails Because Johnson Did Not Deliver Property to CCU for Safekeeping and Return.**

Under Kentucky law, bailment requires delivery of personal property to another in trust for a specific purpose, under an express or implied agreement that the property will be returned or duly accounted for when that purpose is accomplished. *Jones v. Hanna*, 814 S.W.2d 287, 289 (Ky. Ct. App. 1991); see *Texas Capital Bank, N.A. v. First American Title Insurance Co.*, 822 F. Supp. 2d 678, 686-87 (W.D. Ky. 2011) (quoting *Jones* and applying that definition to find a constructive bailment). Assuming without deciding that digital information can be bailed, Johnson does not allege that he transferred exclusive possession of his information, lost the ability to use it, or expected the same information to be returned. He alleges that website communications were copied. Compl. ¶¶ 31-42. Copying information while the originator retains it is unlike delivery of property into another's custody.

Even if intangible property like Website analytics could be the subject of a bailment action (which CCU does not believe is accurate), the Complaint does not plead the custodial and return-oriented features of a bailment relationship. Johnson does not allege an agreement that CCU would return, delete, or surrender a particular copy of his information when a transaction ended, or that CCU failed to do so on demand. Nor does he allege loss or damage to an item entrusted for safekeeping. The same information remained available to him, and the asserted wrong is alleged duplication and disclosure. Even under an assumption favorable to Plaintiff about digital property, those facts do not describe a bailment.

Courts applying bailment principles to data have dismissed claims for that reason. On remand following the Sixth Circuit's standing decision, the district court in *Galaria v. Nationwide Mutual Insurance Co.* dismissed the bailment claim because the plaintiffs retained and continued using their identifiers, had not transferred custody or control, and could not plausibly allege an agreement requiring the data's return. No. 2:13-CV-118, 2017 WL 4918634, at *13-14 (S.D. Ohio

Oct. 31, 2017). Count VI's statement that CCU was to "account for" the information merely repeats a bailment term; it does not identify an agreement to return, delete, or surrender any property. Compl. ¶¶ 208-12. Nor does Johnson allege that CCU lost, damaged, or refused to return an identifiable item. Count VI should be dismissed.

### 7. Count VII Fails Because Johnson Does Not Allege an Ascertainable KCPA Loss Caused by the Challenged Practice.

The Kentucky Consumer Protection Act prohibits unfair, false, misleading, or deceptive practices in trade or commerce, but its private remedy is limited. A consumer must have purchased or leased goods or services primarily for personal, family, or household purposes and "thereby" suffered an ascertainable loss of money or property from the challenged practice. KRS §§ 367.170, 367.220(1). The loss must have a causal nexus to the alleged conduct. *Holland v. United Services Automobile Association*, 707 S.W.3d 541, 549-53 (Ky. App. 2025).

Even if Johnson obtained a covered service and adequately alleged a deceptive omission, he does not identify an ascertainable loss. He alleges no overcharge, lost funds, denied service, account impairment, or amount paid for a representation that the website used no analytics. The diminished value of unspecified information, lost privacy, CCU's alleged gain, and a generalized lost benefit of the bargain are not facts identifying money or property Johnson lost. Compl. ¶¶ 226-33. Nor does the Complaint tie a particular statement Johnson saw to a transaction he would have declined or undertaken on different economic terms. Because Count VII lacks a measurable loss caused by the alleged practice, it should be dismissed.

The KCPA's private remedy is not a means to enforce every allegedly unfair practice in the abstract. *Holland* requires an ascertainable loss connected to the challenged act. 707 S.W.3d at 549-53. Thus, even if the alleged omission could qualify as deceptive (which it is not) and even if Johnson purchased something (and there are no allegations at all that he purchased or leased anything), the Complaint must still identify an economic consequence to him. It does not allege

that an account fee, interest rate, loan term, or service charge changed; that he paid a premium for a website represented to be free of analytics; or that he lost funds because of a transaction induced by a specific statement. General loss of confidentiality and CCU's alleged gain do not identify money or property Johnson lost.

**8. Counts VIII Through X Fail Because the Alleged Communications Were Directed to a Consenting Party and Each Count Omits Facts Necessary to Establish the Statutory Elements.**

Plaintiff divides his ECPA theory into three counts: interception under the Wiretap Act, divulgence by an electronic communication service provider while a communication is in transmission, and disclosure by such a provider while a communication is in electronic storage. The provisions have different elements, but the Complaint treats the statutory vocabulary as interchangeable. It repeatedly calls the same unidentified information "contents," CCU an "electronic communication service," and the alleged acquisition both an interception in transit and a disclosure from storage. Facts, not labels, must place the alleged conduct within each provision.

a. <u>The Same Party-and-Consent Exception and Premise Defeats All Three ECPA Counts.</u>

The Complaint's three ECPA theories invoke different prohibitions, so the Wiretap Act's § 2511(2)(d) single-party exception does not govern every count. But the same dispositive premise does: Johnson alleges communications directed to CCU through CCU's own website, and CCU was therefore a party, addressee, and intended recipient. When the Complaint characterizes the browser as sending a separate request directly to Google, its own theory makes Google the intended recipient of that transmission. The statute does not prohibit a party or intended recipient from receiving a communication merely because technology simultaneously directs a copy to a service provider.

For Count VIII, § 2511(2)(d) provides that an interception is not unlawful when the person is a party to the communication or one party has given prior consent, unless the interception is for

the purpose of committing an independent criminal or tortious act. Johnson alleges that he communicated through CCU's website to obtain services from CCU. Compl. ¶¶ 32, 83, 87, 91. CCU was the intended recipient and a party to those communications. And to the extent the alleged communication was a browser request sent directly to Google's server, *In re Google Inc. Cookie Placement Consumer Privacy Litigation* held that advertising providers receiving direct GET requests were parties to those transmissions. 806 F.3d 125, 142-45 (3d Cir. 2015).

The crime-or-tort proviso does not change that result. The interception must have been made for the purpose of facilitating a criminal or tortious act independent of the interception itself. *In re Google Cookie Placement*, 806 F.3d at 145-46; *Caro v. Weintraub*, 618 F.3d 94, 100 (2d Cir. 2010); *Bowens v. Aftermath Entertainment*, 254 F. Supp. 2d 629, 642 (E.D. Mich. 2003). The Complaint alleges analytics, marketing, cost savings, and profit. Compl. ¶¶ 5, 248-49. Those ordinary business objectives are not an independent crime or tort, and pointing back to the alleged interception or disclosure itself is circular. *Martinez v. Mentavi, Inc.* applied that rule in a materially similar website-tracking case and dismissed the ECPA claim because the website operator was a party and no independent criminal or tortious purpose was plausibly alleged. 2025 WL 3780427 (W.D. Mich. Oct. 9, 2025).

Counts IX and X contain their own recipient, agent, and consent limitations. Section 2511(3)(a) excludes a communication made to the provider or its agent, and § 2511(3)(b)(ii) permits divulgence with the lawful consent of an originator, addressee, or intended recipient. Likewise, the SCA permits disclosure to an addressee, intended recipient, or that recipient's agent, 18 U.S.C. § 2702(b)(1), and with the lawful consent of the originator, addressee, or intended recipient, *id.* § 2702(b)(3). On the Complaint's own allegations, CCU was the addressee and intended recipient and allegedly authorized the challenged configuration. Thus, even before the

independent threshold defects discussed below, the Complaint does not allege an unauthorized disclosure to an outsider within any of the three provisions.

b. The Federal Wiretapping Claims All Fail Because Johnson Does Not Identify Protected Contents or a Contemporaneous Acquisition.

Section 2511(1) prohibits specified intentional interceptions, uses, and disclosures of wire, oral, or electronic communications. An “intercept” is an acquisition of the communication’s “contents” through an electronic, mechanical, or other device, and "contents" means information concerning the communication’s substance, purport, or meaning. 18 U.S.C. §§ 2510(4), (8), 2511(1). Thus, the statute does not cover every piece of information generated when a user visits a website. The distinction between content and metadata or record information or routing information is contextual: a detailed URL or search query may reveal substance, while an IP address, generic page address, click, or automatically generated event ordinarily may not. See *In re Google Inc. Cookie Placement Consumer Privacy Litigation*, 806 F.3d 125, 136-39 (3d Cir. 2015); In re Zynga Privacy Litigation, 750 F.3d 1098, 1106-09 (9th Cir. 2014).

The statutory term “contents” in the context of the ECPA is not coextensive with every category of information that another privacy regime might call personal or nonpublic. A datum can identify a device or route a request without conveying the substance of what the user meant to communicate; conversely, a detailed URL or search query can reveal substance depending on its contents. See *In re Google Cookie Placement*, 806 F.3d at 136-39. That contextual inquiry cannot be performed on the collective label “Personal and Financial Information.” The Complaint must identify the communication and the information acquired from it.

The Complaint does not identify a particular Johnson communication whose contents were acquired. The only specific allegation made is that Google Analytics reported page views, button clicks, and scrolls. Compl. ¶ 42. Plaintiff does not identify any specific URL or other communication and explain what substance it conveyed. The district court in *Cook v. GameStop*,

*Inc.* held that allegations concerning mouse movements, clicks, URLs, and unspecified keystrokes did not plausibly identify the contents of a communication, as opposed to records of interaction. 689 F. Supp. 3d 58, 68-71 (W.D. Pa. 2023). Other courts have drawn the same line for automatically generated event data. *See Vasil v. Kiip, Inc*., No. 16-CV-09937, 2018 WL 1156328, at *2 (N.D. Ill. Mar. 5, 2018)(dismissing wiretapping claims); *In re TikTok, Inc. In-App Browser Privacy Litigation*, No. 24 C 2110, 2024 WL 4367849, at *11 (N.D. Ill. Oct. 1, 2024)(same); *Yoon v. Lululemon USA, Inc.*, 549 F. Supp. 3d 1073, 1081-82 (C.D. Cal. 2021)(same).

The Complaint does not identify a form field Johnson completed, the text he entered, a search he performed, a specific detailed URL, or the tracker that allegedly captured it. It does not allege whether the asserted information came from a public page, an application page, the authenticated portal, or a separate service. A plaintiff asserting a tracker-based wiretap claim must identify the communication allegedly intercepted rather than rely on generalized descriptions of what source code can collect. See *Murphy v. Thomas Jefferson University Hospitals, Inc.*, No. 22-4674, 2023 WL 7017734, at *3-4 (E.D. Pa. Oct. 10, 2023). Paragraph 4's omnibus list and paragraph 36's conclusion that "that information" was intercepted do not satisfy that requirement.

The Complaint also relies on the word "contemporaneously" without tying it to a specific Johnson transmission. Under Sixth Circuit law, interception requires acquisition while a communication is in flight. *Luis v. Zang*, 833 F.3d 619, 627-29 (6th Cir. 2016). Paragraphs 32 through 36 describe tracker operation generically and conclude that all alleged information was simultaneously acquired. The Court need not decide whether that description would establish contemporaneity for some event because Count VIII independently fails to identify protected contents and is barred by the party exception. Repetition of the statutory timing term does not establish facts demonstrating that it occurred, nor does it supply the missing communication

required to have been intercepted. See *Rodriguez v. Google LLC*, No. 20-CV-04688-RS, 2022 WL 214552, at *2 (N.D. Cal. Jan. 25, 2022).

*Luis* illustrates the difference between factual allegations and a timing label. The complaint there described a program that recorded specified categories of computer activity, including material typed by users, in real time and routed it before the communications came to rest. 833 F.3d at 627-29. Johnson's Complaint describes tracker operation generally and then states that all information in its omnibus list was acquired "instantaneously." It does not identify the Johnson communication, the route it took, or the point at which Google acquired it. If information first reached its intended destination and was later processed or disclosed, that is not an interception in flight; if the browser sent a separate request directly to Google, the party analysis below applies. Repeating the timing term does not resolve either path.

Section 2511(2)(d) separately provides that interception is not unlawful when the person is a party to the communication or one party has given prior consent, unless the interception is for the purpose of committing an independent criminal or tortious act. Johnson alleges that he communicated through CCU's website to obtain services from CCU. Compl. ¶¶ 32, 83, 87, 91. CCU was the intended recipient and a party to those communications. A website operator does not become a stranger to communications directed to its own site because it allegedly uses a vendor to process or analyze them.

To the extent the alleged communication is instead a browser request sent directly to Google's server, *In re Google Cookie Placement* held that advertising providers receiving direct GET requests were parties to those transmissions. 806 F.3d at 142-45. Plaintiff may disagree with treating Google as an intended recipient, but his own theory alleges that the browser transmitted information directly to the third-party server under the tracker's instructions. Compl. ¶¶ 32-34.

Under either characterization, the Complaint does not plausibly allege an interception by an entity that was neither a party nor an intended recipient.

The crime-or-tort proviso does not change the result. It applies only when the interception's purpose is to facilitate a criminal or tortious act independent of the interception itself. *In re Google Cookie Placement*, 806 F.3d at 145-46. The Complaint alleges marketing, analytics, cost savings, and profit, Compl. ¶¶ 5, 248-49, but those business objectives are not themselves an independent crime or tort. And pointing back to the same alleged privacy invasion or unauthorized interception is circular. Count VIII should be dismissed.

c. Count IX Independently Fails Because CCU Is Not a Public Electronic Communication Service Provider and No Contents Were Divulged While in Transmission.

Section 2511(3)(a) applies to a person or entity "providing an electronic communication service to the public" and restricts that provider's divulgence of contents while a communication is in transmission on the service. An electronic communication service ("ECS") is a service that provides users the ability to send or receive wire or electronic communications. 18 U.S.C. §§ 2510(15), 2511(3)(a).

CCU is alleged to provide credit-union and financial services, not internet access, email, messaging, or another communication service to the public. Compl. ¶¶ 2, 17, 19. Courts consistently distinguish companies that furnish communications services from ordinary businesses that merely operate interactive websites. See *Crowley v. CyberSource Corp.*, 166 F. Supp. 2d 1263, 1270-71 (N.D. Cal. 2001) (online retailer was not an ECS provider); *In re JetBlue Airways Corp. Privacy Litigation*, 379 F. Supp. 2d 299, 307-08 (E.D.N.Y. 2005) (holding that an airline's online reservation website did not make it an ECS provider because the airline supplied air-travel services, not internet access, and merely used the website to communicate with customers); *Dyer v. Northwest Airlines Corp.*, 334 F. Supp. 2d 1196, 1199-1201 (D.N.D. 2004). Allowing customers

to submit information through a website or portal does not transform the underlying financial service into a public electronic communication service.

The ECS definition is functional, but it is not limitless. Nearly every modern commercial website allows users to send requests and receive data. The cited cases ask whether the service the defendant furnishes to the public is the ability to send or receive communications, as with email, messaging, or network access, rather than whether electronic communications happen to be used to deliver the defendant's underlying product. *Crowley*, 166 F. Supp. 2d at 1270-71; In re JetBlue, 379 F. Supp. 2d at 307-08; *Dyer*, 334 F. Supp. 2d at 1199-1201. CCU's alleged service is financial in nature: accounts, loans, payments, and related banking functions. The website is a means of providing those services, not a public electronic-communication service in its own right.

Count IX also does not identify contents that CCU divulged "while in transmission on that service." It relies on the same page-view, click, and scroll allegations and the same undifferentiated list of possible information. Compl. ¶¶ 4, 42, 257-64. The provision also excludes a communication made to the provider or its agent. 18 U.S.C. § 2511(3)(a). Johnson alleges that he sent information through CCU's website for CCU to provide financial services; he does not identify a different communication carried by a public ECS that CCU then divulged. Because CCU is not plausibly alleged to be an ECS provider and no particular protected content is alleged to have been divulged in transmission by such a service, Count IX fails at the threshold.

The phrase "while in transmission on that service" is an additional limitation. Count IX does not identify a communication carried on a CCU-provided ECS, the point during that carriage when CCU disclosed its contents, or a recipient outside the provider, its agent, or the intended addressee. The Complaint is permitted to plead alternative statutory theories, but each theory still needs facts placing an identified communication within its own statutory posture. Simply alleging

the same unidentified data both intercepted in flight and divulged by a service provider does not establish either theory.

d. Count X Independently Fails Because CCU Is Not a Public Electronic Communication Service Provider and No Contents Were Held in Electronic Storage.

The Stored Communications Act claim is narrower still. Section 2702(a)(1) restricts an ECS provider's knowing divulgence of a communication's contents "while in electronic storage by that service." "Electronic storage" is a term of art, not a synonym for information that is saved somewhere. The statute identifies temporary, intermediate storage incidental to transmission and storage maintained for backup protection. 18 U.S.C. § 2510(17). Count X does not allege either form. It does not identify a message awaiting delivery, a backup copy maintained by a communications provider, or any provider-side storage arrangement. Its allegation that communications were "immediately placed into storage" simply repeats the statutory conclusion without the facts that would make the storage covered.

As described above, the Complaint does not plausibly allege that CCU provides an ECS to the public. It also does not allege facts showing that any identified Johnson communication was held in the statutory form of storage by that service. Count X states that communications were "immediately placed into storage" on CCU's website or associated files, Compl. ¶¶ 270-71, but that is a statutory conclusion. It does not identify a stored communication, where it resided, whether the storage was temporary and incidental to transmission or for backup, or how CCU divulged it from storage.

Cookies or files on a user's own device do not supply the missing provider-side electronic storage. In *re DoubleClick Inc.* Privacy Litigation, interpreting the same statutory definition, held that cookies residing on user hard drives for an indefinite period were not in "electronic storage." 154 F. Supp. 2d 497, 511-12 (S.D.N.Y. 2001). Count X's references to browsers, cookies, and

files therefore do not state a claim. And, as with Counts VIII and IX, the Complaint fails to identify the contents of a particular stored communication. Count X should be dismissed.

**9. Count XI Fails Because No Computational Gate Was Bypassed and No Qualifying CFAA Loss Is Alleged.**

The CFAA targets digital trespass, not every allegedly unauthorized use or disclosure of information. A person "exceeds authorized access" only by obtaining information from an area of a computer—such as a file, folder, or database—that the person is not permitted to access. *Van Buren v. United States*, 593 U.S. 374, 389-96 (2021). The Sixth Circuit applies that "gates-up-or-down" inquiry and holds that an improper purpose does not turn otherwise permitted access into a CFAA violation. *Abu v. Dickson*, 107 F.4th 508, 516-20 (6th Cir. 2024).

The Complaint identifies no off-limits area of Johnson's computer or device that CCU entered. It alleges no password bypass, technical circumvention, malware, or access to a protected file. It alleges that code loaded when Johnson voluntarily visited CCU's website and transmitted website events. Compl. ¶¶ 31-36. The allegations concern purpose and data handling, not access through a closed computational gate.

A civil CFAA claim also requires one of the aggravating factors in § 1030(c)(4)(A)(i), such as at least $5,000 in statutory "loss" during a one-year period. 18 U.S.C. § 1030(g). "Loss" concerns reasonable response and restoration costs or revenue lost from interruption of service; "damage" concerns impairment to data or a system. *Id.* § 1030(e)(8), (11). Johnson alleges no response or restoration costs, service interruption, or system impairment. "Loss" encompasses reasonable costs of responding to an offense, conducting a damage assessment, or restoring affected data or systems, as well as revenue loss or other consequential damages caused by an interruption of service; "damage" means impairment to the integrity or availability of data or a system. 18 U.S.C. § 1030(e)(8), (11). Johnson alleges no such response, assessment, or restoration costs, no interruption of service or resulting revenue loss, and no system impairment. His asserted

market value of his information does not fit any statutory category of CFAA loss. See *In re Google Inc. Cookie Placement Consumer Privacy Litigation*, 806 F.3d 125, 148-49 (3d Cir. 2015) (holding that allegations that internet usage information had market value did not establish CFAA loss). The assertion that the alleged disclosure threatened public health or safety merely repeats statutory language and identifies no affected health, safety, or critical system. Compl. ¶ 286. Count XI should be dismissed.

**10. Count XII Fails Because Johnson Alleges Only Electronic Website Activity and CCU Was a Consenting Party.**

Kentucky defines "eavesdrop" as using a device to overhear, record, amplify, or transmit part of a "wire or oral communication" of others without the consent of at least one party. KRS §§ 526.010, 526.020. Unlike the federal statute, Chapter 526 does not separately list "electronic communications." Count XII repeatedly alleges acquisition of "private electronic communications" through source code, browsers, cookies, trackers, and servers. Compl. ¶¶ 292, 301. It does not identify an oral communication or plead facts explaining how a particular website event constitutes a covered wire communication under the Kentucky provision. The Court need not hold that internet data can never fall within Chapter 526; it need only enforce the requirement that Plaintiff plead the statutory category he invokes. A list of electronic components and the label "private conversation" do not do so.

The claim also fails under the statute's one-party-consent rule. The absence of consent from "at least one" party is part of the definition. KRS § 526.010. Johnson alleges communications directed to CCU through CCU's own website. Compl. ¶¶ 32, 83, 87, 91, 303. CCU was therefore a party and, under Plaintiff's theory, authorized the configuration at issue. Kentucky permits recording when one party consents. See *Gleason v. Magna Wave, Inc.*, 727 S.W.3d 714 (Ky. App. 2025). Alleged duplication to Google does not change CCU's status as a consenting party to the communication asserted against it.

Plaintiff's citation to *United States v. Spence* does not expand the statutory text. That decision observed that federal law sets a floor for state wiretap restrictions. No. 1:07-CR-146, 2008 WL 11417828, at *15 (E.D. Tenn. Apr. 22, 2008). It did not rewrite KRS § 526.010 to add a separate electronic-communications category or eliminate one-party consent.

Finally, Chapter 526 is a criminal code provision and supplies no express civil action or statutory-damages remedy. For the covered-communication and consent reasons above, Count XII should be dismissed.

## IV. CONCLUSION

Johnson lacks Article III standing, and has otherwise failed to sufficiently plead threshold elements of each count of his Complaint. CCU respectfully requests that the Court dismiss the Complaint under Rules 12(b)(1) and 12(b)(6).

Respectfully submitted,

***/s/ John D. "Chip" Clay***

John D. "Chip" Clay
Justin Holmes*
Michi Rodriguez*
**GRSM50**
325 West Main Street, Suite 2300
Louisville, KY 40202
(502) 371-1254
cclay@grsm.com
jholmes@grsm.com
mvrodriguez@grsm.com

**Pro hac vice forthcoming.*