**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**

| | |
|---|---|
| JARED JOHNSON, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>COMMONWEALTH FEDERAL CREDIT UNION a/k/a COMMONWEALTH CREDIT UNION<br><br>Defendant. | Civil Action No. 3:25-cv-42-KKC |

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Plaintiff, Jared Johnson, individually, and on behalf of all others similarly situated (hereinafter "Plaintiff" or "Johnson") respectfully submits this Response in Opposition to Defendant Commonwealth Federal Credit Union a/k/a Commonwealth Credit Union ("Commonwealth" or "Defendant")'s Motion to Dismiss the Amended Complaint. D.E. 47, 53.

## INTRODUCTION

More than a year after this case was filed in August of 2025, the parties are still at the pleadings stage. D.E. 1 (complaint). This case is about a credit union that improperly shared its customers' data with tech companies in violation of law. D.E. 47 (amended complaint). After losing its attempt to arbitrate this dispute, D.E. 37, Commonwealth has filed a sprawling motion to dismiss, attacking everything from standing on down. D.E. 53 (motion to dismiss). In its motion to dismiss, Commonwealth calls the third-party analytics tools it used "commonplace." D.E. 53 at 10, PageID# 575. Commonwealth's bid to dismiss this case thus amounts to, "*Well, Judge, everyone was doing this, so we shouldn't be liable for something everyone was doing*." A commercial practice like data collection can be ubiquitous but still unlawful, as it is here.

The conduct alleged in this case involves the disclosure of the most sensitive kinds of data: a person's financial information and condition. This is not a case where a plaintiff is trying to secure a windfall based on how he jiggled his mouse while alone in his basement buying retail products. This is a case about Commonwealth sharing with tech companies the choices that a consumer-customer makes while interacting with its website, choices like which products the consumer is interested in, applications for financial products, and applications for a new account. *E.g.*, D.E. 47 at ¶¶ 42, 45, 48, 55. This is highly sensitive data that Commonwealth was bound by law to safeguard. Instead it shared it. Commonwealth's own revisions to its systems since the filing of this case evidence consciousness of guilt, exposure, and risk. D.E. 47 at ¶¶ 94–106.

## FACTUAL AND PROCEDURAL BACKGROUND

Commonwealth is a multi billion dollar financial institution in Kentucky. D.E. 47 at ¶ 2. Through its website, Commonwealth configured tracking technologies to track the choices of consumers like Plaintiff. D.E. 47 at ¶¶ 3, 4, 9. Commonwealth used a variety of trackers to collect a vast assortment of consumer data, including Google Analytics, Alphonso, Simpli.fi, Google Tag Manager, TVSquared, and the Meta Pixel. D.E. 47 at ¶¶ 38, 41. These trackers allow Commonwealth to share with tech companies not only who is using its website and whether that person is a customer, but what types of products the user is viewing on the website and applications for new financial products. D.E. 47 at ¶¶ 42–55. The configurations of these technologies allow the users to be identified. D.E. 47 at ¶¶ 56–70. This is particularly important for an application for credit, where third parties like tech companies can associate the Commonwealth-related activity with the device the consumer is using. D.E. 47 at ¶¶ 12, 46, 52, 54, 68, 69. This data goes not only to third but fourth parties too. D.E. 47 at ¶¶ 13, 30, 37, 71–79, 90, 91. This is far more than just record information of no use to anymore. This is real data that can be and was sold – for a price.

Applying for credit is an activity that involves sensitive personal financial information. Financial institutions like Commonwealth have access to information that, if communicated to a stranger to that relationship, could inform the stranger that the applicant is cash-poor, has bad credit, recently secured a windfall, or wants or needs credit. The disclosure of this wholly private and confidential information—that personally identifies the consumer—is offensive.

The conduct in this case bespeaks a defendant eager to escape liability for its conduct. Commonwealth already tried to escape this case via arbitration. D.E. 37. Commonwealth was, in a word, sloppy. *E.g.*, D.E. 37 at 8, PageID# 380 ("Put simply, due to Commonwealth's misidentification, the document to be incorporated is squarely in doubt. The signed document purports to incorporate a document which simply does not exist."). Indeed, this Court went out of its way to call the facts on the arbitration motion a "cautionary tale." D.E. 37 at 14, PageID# 386 ("Commonwealth's desire to address this dispute individually through arbitration, rather than class action litigation, could have been realized if only it had taken greater care to ensure precision in its drafting.") (quoting Former Secretary Rumsfeld). Just as with its contractual problems, Commonwealth has cleaned up its disclosures since this case was filed. D.E. 47 at ¶¶ 94–106. These post-lawsuit revisions underscore the material omissions that plagued the website's older disclosures.[1] D.E. 47 at ¶ 97. Indeed, the disclosures now direct users to Google's own disclosures to show how Google uses consumer data. D.E. 47 at ¶ 101.

The fact that tech companies have what Commonwealth argues is innocuous data is in fact a nefarious behavioral monitoring and predictive advertisement business. Commonwealth facilitated it by taking customer data without consent. A person's application for credit (or even

[1] However, the disclosures still fail to identify all third party tracking software used and whether the data was used by third parties beyond Google for training a marketing algorithm.

that they are seeking more credit) can disclose all kinds of private facts about them. So too can a person's browsing decisions on the Commonwealth website. The data Commonwealth shared is confidential financial information that it should not have shared. And indeed, Commonwealth's recitation of the facts highlights what it did *not* share. D.E. 53 at 15, PageID# 580. That is a tell.

The remedy for such conduct is an open question, hence the number of different legal theories asserted here. Courts across the country differ in how they address instances of online tracking. *See generally Allison v. PHH Mortg.*, No. 25-CV-05323-RFL, 2026 WL 1353827 (N.D. Cal. May 14, 2026). That is why Plaintiff has pled here in the alternative, as is his right under Rule 8. But the bottom line is that taking people's financial data (that is private) and sharing it is commercially lucrative and unlawful. After Plaintiff used Commonwealth's website, he began to see targeted ads for financial products which proves the data was sent to marketing algorithms and is being used for the benefit of fourth parties. D.E. 47 at ¶ 126. This is a breach of trust.

## ARGUMENT

Commonwealth offers a litany of theories on Plaintiff's complaint, which is well pled and easily survives review under Rule 12(b)(6). Commonwealth's arguments about standing have been wholly rejected by courts from coast to coast.

## STANDARD OF REVIEW

Rule 8(a)(2) requires only a short and plain statement of the claim giving "the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This standard "does not require 'detailed factual allegations,'" but merely expects "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When considering a Rule 12(b)(6) motion, the Court must accept factual allegations in the complaint as true and construe the

pleadings in the light most favorable to the nonmoving party. *Parrino v. Price*, 869 F.3d 392, 397 (6th Cir. 2017). All reasonable inferences are to be drawn in the pleader's favor. *Hile v. Michigan*, 86 F.4th 269, 273 (6th Cir. 2023). In a facial attack under Rule 12(b)(1), the standard of review is the same as a 12(b)(6). *Curry v. Kentucky Cabinet for Health & Fam. Servs.*, No. 3:17-CV-00730-GNS, 2018 WL 1324159, at *2 n.6 (W.D. Ky. Mar. 14, 2018).

## I. Standing

Commonwealth took private information about Plaintiff and shared it with third and fourth parties. D.E. 47 at ¶¶ 3, 4, 9, 13, 30, 37, 42–55. That resembles the classic tort of intrusion upon seclusion, and the conduct here is directly traceable to Commonwealth. Standing is no more complicated than that.

Under binding Sixth Circuit precedent, disclosure of private information to tech companies constitutes redressable injury. *Salazar v. Paramount Glob.*, 133 F.4th 642, 647 (6th Cir. 2025), *cert. granted*, 146 S. Ct. 1591 (2026) ("Salazar's asserted injury resembles the harms addressed by these torts because he alleges that Paramount disclosed his private information to Facebook without his knowledge or consent. So Salazar can show that he suffered a concrete injury by reference to well-established privacy harms."). Cases nationwide have said the same in recent weeks. *See Rand v. Eyemart Express, L.L.C.*, No. 25-10784, __ F.4th __, 2026 WL 3180055, at *3 (5th Cir. Oct. 23, 2026) ("Post-*TransUnion*, our sister circuits have consistently held that unauthorized disclosure of individuals' private browsing activity, along with identifiable personal information, constitutes an injury in fact.") (finding the plaintiff had standing); *Black v. IEC Grp., Inc.*, No. 25-5952, __ F.4th __, 2026 WL 3031874, at *2 (9th Cir. Oct. 9, 2026) ("The harm Plaintiffs allege consists of the unauthorized disclosure of sensitive facts about their health that they have entrusted Defendant to keep private.") (finding standing); *see also generally Pileggi v.*

*Washington Newspaper Publ'g Co., LLC*, 146 F.4th 1219, 1229 (D.C. Cir. 2025).

Where financial information is concerned, courts have generally found a sufficient basis for standing rooted in the common law torts of public disclosure of private facts or intrusion upon seclusion. *Nayab v. Cap. One Bank (USA), N.A.*, 942 F.3d 480, 492 (9th Cir. 2019) ("This harm is highly offensive and is not trivial because a credit report can contain highly personal information."); *Heagerty v. Equifax Info. Servs. LLC*, 447 F. Supp. 3d 1328, 1337 (N.D. Ga. 2020) ("intrusion on financial information" was a sufficient basis for standing); *Blumenfeld v. Regions Bank*, 374 F. Supp. 3d 1165, 1170 (N.D. Ala. 2019) ("Under the correct standard, the alleged harm in this case—disclosure of Ms. Blumenfeld's private financial information to a third party—bears a close relationship to the common law's protection against disclosure of private information.").

The injury here is precisely the type of injury sufficient for Article III standing. Indeed, an illustration from the Restatement of Torts for the section on intrusion upon seclusion is instructive: "A is seeking evidence for use in a civil action he is bringing against B. He goes to the bank in which B has his personal account, exhibits a forged court order, and demands to be allowed to examine the bank's records of the account. The bank submits to the order and permits him to do so. A has invaded B's privacy." Restatement (Second) of Torts § 652B at cmt. b (1977). As this illustration makes clear, the data Commonwealth allegedly disclosed arises to the level of Article III injury. The GLBA's definitions treat the fact that someone is a customer, and information collected through cookies, as protected financial information. 16 C.F.R. § 313.3(o)(2).

Commonwealth's recitation again tries to frame the issue in inverse terms. Because Commonwealth did not share Plaintiff's Social Security number, it says, his injury is not redressable. D.E. 53 at 16, PageID# 581. But the standard is not whether a Social Security number is shared, it is whether private financial information is shared. Plaintiff's allegations do not center

on whether mouse movements were shared, but instead focus on whether Defendant shared Plaintiff's private and sensitive information about his applications and financial services with third and fourth parties without his consent. D.E. 47 at ¶¶ 125, 126, 134. This is part and parcel of Commonwealth's disclosure of consumers' interest in an application for credit and use of financial services offered by Commonwealth. D.E. 47 at ¶¶ 47–55. And that data disclosed was personally identifiable. D.E. 47 at ¶¶ 59–70. This is a far cry from Defendant's proffered authority about mere scrolling and mouse clicks. D.E. 53 at 17, PageID# 582.

Under Defendant's theory of standing, a plaintiff would have to show not only that his data was taken, but that purported hackers actually used it to open up numerous credit cards in his name just to have his complaint taken seriously in federal court. That is not the law. Data has inherent value. *In re Meta Pixel Tax Filing Cases*, 724 F. Supp. 3d 987, 1013 (N.D. Cal. 2024) ("Meta fails to grapple with the substance of plaintiffs' theory in this case that they provided something of value to Meta and received nothing in return. This can constitute an economic injury."); *Calhoun v. Google LLC*, 526 F. Supp. 3d 605, 636 (N.D. Cal. 2021) ("[P]laintiffs who suffered a loss of their personal information suffered economic injury and had standing."). Having your personal financial information taken and sold is a concrete injury. Plaintiff need not itemize at this stage what his damages are, and courts nationwide have recognized that where the plaintiff has a protected interest in the information, he or she has standing to seek redress when it is taken.

## II. Defendant's Arguments Under Rule 12(b)(6)

Plaintiff addresses each count in turn.

### A. Negligence – Count One

Negligence, of course, consists of duty, breach, causation, and damages. *Schneider Electric USA, Inc. v. Williams*, 733 S.W.3d 180, 191 (Ky. 2026). Commonwealth vaguely assumes it "owed

a duty to exercise reasonable care in handling sensitive customer information" (indeed, how could it not, as a bank?) but disputes that the operative complaint alleges sensitive information was transmitted to constitute a breach. D.E. 53 at 21, PageID# 586.

The allegations here that Commonwealth breached a duty are concrete and well pled. Commonwealth simply ignores those allegations. *See* D.E. 47 at ¶¶ 44–51. They are also plaintiff-specific, *id.* ¶¶ 124–26, unlike the allegations in the *Stevens* case on which Commonwealth relies. *Stevens v. TD Bank, N.A.*, 2025 WL 1779164, at *5-6 (D.N.J. June 27, 2025) (dismissing without prejudice because plaintiff's complaint failed to identify the information he provided to the bank). Contrary to Commonwealth's suggestion, the information transmitted was sensitive, protected, and personally identifiable. *Cf. Gassman v. Guardian Credit Union*, 2026 WL 884211, at *4 (E.D. Wis. Mar. 31, 2026) (sustaining negligence claim in bank tracking technology case and noting that whether the "information shared actually constituted [personal and financial information] . . . *is a factual dispute that cannot be resolved on the pleadings*") (emphasis added). So too here.

Commonwealth informed Google when a user accessed the online-banking login page, entered a username, and reached the page to input a password. D.E. 47 at ¶¶ 43–44. It also transmitted each step of the account-creation process to Google, including that the user was entering his or her Social Security number. *Id.* at ¶¶ 44–46 (alleging Google was allowed "to follow the user step-by-step through Commonwealth's account opening process"). Similar transmissions occurred in the credit card application process. *Id.* ¶¶ at 48–54. This information was personally identifying or enabled identification. Commonwealth's trackers were configured to transmit persistent identifiers alongside these events that "let third parties, like Google and Meta, relate each interaction back to specific users." *Id.* at ¶ 56. Commonwealth's loan-application pages transmitted a session-level guestId together with a deviceId stored in the browser's local storage.

That deviceId persists across sessions and "may remain stored on the device indefinitely," allowing recipients to recognize the same device each time it returns. *Id.* at ¶¶ 61–67. Because the identifiers are generated while a user supplies identifying information, the resulting activity is "linked or linkable" to the identified applicant. *Id.* at ¶¶ 68–70. The recipients are companies that maintain databases linking device identifiers to individual users and advertise their ability to do so. *Id.* at ¶ 59. Data that is linked or linkable to an individual is, by definition, personal information. *Id.* at ¶¶ 58–60. Financial privacy law also protects the information transmitted and treats it as sensitive. *Id.* at ¶¶ 10, 12, 197–98; *see also* 15 U.S.C. § 6802; 16 C.F.R. § 313.3(o) (defining and providing examples of "personally identifiable financial information"). This is classic negligence, no matter the state – transmitting protected information is negligent. *Allison v. PHH Mortg.*, 2026 WL 1353827, at *6 (finding negligence claim against mortgage company that shared financial information could proceed).

In a data breach case, plaintiffs generally allege a company negligently safeguarded their data. The comparison is not so far afield here. *McKenzie v. Allconnect, Inc.*, 369 F. Supp. 3d 810 (E.D. Ky. 2019), does not help Commonwealth. There, an Allconnect employee was tricked into sending a phisher their fellow employees' personal information, and that inadvertent disclosure still supported a negligence claim against Allconnect. *Id.* at 814, 817–18. Here, Commonwealth configured tracking technologies on its web properties and knew or should have known they would transfer private information to third parties. D.E. 47 at ¶ 200. Mishandling sensitive information is negligent. That is not only a reasonable negligence theory – it is common sense.

Commonwealth's causation argument fails for the same reason. The causation element consists of the distinct components of but-for causation and proximate causation. *CVS Pharm., Inc. v. Chaney*, __ S.W.3d __, 2026 WL 1108778, at *2 (Ky. Ct. App. Apr. 24, 2026). The former

requires a direct identifiable nexus between the breach and the plaintiff's damages while the latter rests on whether liability was foreseeable given the breach conduct. *Id.* Here, Plaintiff has pled both. D.E. 47 at ¶¶ 203, 204, 205. He need not plead exactly how his data was exploited or that each and every targeted advertisement he saw can already be traced to a particular third party (that would require him to prove his case in advance). Causation is straightforward and flows directly from Commonwealth's own configuration: Commonwealth selected and installed the trackers which caused Johnson's financial-service interactions and identifiers to be transmitted to third parties, and those disclosures harmed Johnson. D.E. 47 at ¶¶ 31–38, 43–70, 124–37, 203–05.

Johnson's damages allegations are likewise sufficient at the pleading stage. Johnson alleges loss of privacy, unauthorized disclosure and access, targeted financial advertisements, lost benefit of the bargain, diminution in the value of his Personal and Financial Information, emotional distress, and loss of control. *Id.* 47 at ¶¶ 137, 203–04. The allegations go well beyond mere "possibility of future harm." *Gill v. Burress*, 382 S.W.3d 57, 64 (Ky. Ct. App. 2012). Kentucky courts do not require a plaintiff to plead completed identity theft or lost account funds to state negligence after an unauthorized release of sensitive information; in *McKenzie*, the court held that plaintiffs adequately pled negligence based on allegations similar to Johnson's—monetary loss, lost time, and emotional distress. 369 F. Supp. 3d at 818. In tracking technology cases across the country, courts have held the types of damages Johnson pleads sufficient to state a claim for negligence. *Allison v. PHH Mortg.*, 2026 WL 1353827, at *6 (N.D. Cal. May 14, 2026) (lost time remediating use of information); *K.L. v. Legacy Health*, 2024 WL 4794657, at *11 (diminution in value of PHI); *Doe v. Tenet Healthcare Corp.*, 731 F. Supp. 3d 142, 148–49 (D. Mass. 2024) (privacy violation). The negligence claim survives.

**B. Negligence Per Se – Count Two.**

Kentucky's negligence per se statute provides that "[a] person injured by the violation of any statute may recover from the offender such damages as he sustained by reason of the violation, although a penalty or forfeiture is imposed for such violation." KRS § 446.070. It permits a private right of action when the offender violates a statute that provides no civil remedy if the victim is within the class of persons and injured in a manner which the statute is designed to protect. *Hickey v. General Electric Co.*, 539 S.W.3d 19, 23–24 (Ky. 2018). Johnson concedes that federal law cannot supply the statutory hook for his negligence per se claim. *St. Luke Hosp., Inc. v. Straub*, 354 S.W.3d 529, 534 (Ky. 2011). But Johnson has squarely pled negligence per se based on Kentucky's criminal unlawful-access-to-a-computer statutes, KRS § 434.840 *et seq*. Count II invokes "state law," D.E. 47 at ¶ 210, and the Federal Rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11 (2014) (per curiam).

What matters is that the operative pleading pleads facts which, if true, establish a violation of KRS § 434.840 *et seq*. Kentucky courts have long allowed penal statutes to serve as the predicate for a KRS § 446.070 negligence per se claim. *See Hickey*, 539 S.W.3d at 24–25 (collecting cases); *Clark v. Teamsters Local Union 651*, 2017 WL 6395850, at *5 (E.D. Ky. Dec. 13, 2017) (sustaining plaintiff's negligence per se claim invoking the unlawful access to a computer statute). Under KRS § 434.845, for example:

> (1) A person is guilty of unlawful access to a computer in the first degree when he or she, without the effective consent of the owner, knowingly and willfully, directly or indirectly accesses, causes to be accessed, or attempts to access any computer software, computer program, data, computer, computer system, computer network, or any part thereof, for the purpose of:
>
> (a) Devising or executing any scheme or artifice to defraud; or
>
> (b) Obtaining money, property, or services for themselves or another by means of false or fraudulent pretenses, representations, or promises.

"Access" means "to approach, instruct, communicate with, manipulate, store data in, retrieve or intercept data from, or otherwise make use of any resources of, a computer, computer system, or computer network." KRS § 434.840(1).[2] By embedding and configuring third-party tracking code on its website, Commonwealth *instructed* and *communicated with* Johnson's browser and device,[3] directing them to "initiate communications with the Third Party and transmit information concerning the user's interaction with the Website." D.E. 47 at ¶¶ 31–32, 34. Commonwealth also *stored data* in users' devices, *see id.* ¶¶ 63–64, and *retrieved* and *intercepted data* from those devices, causing "communications and information concerning their financial interactions to be contemporaneously transmitted to Third Parties," *id.* ¶ 35.

The operative complaint also alleges that Commonwealth "purposely and secretly installed the Third Parties' online tracking technologies onto its Website to gather information about Customers" and further its "goal of increasing profitability." *Id.* ¶ 28. Commonwealth "knowingly collected" the information "for the purpose of marketing and profits," *id.* ¶ 264, and it did so by means of false privacy representations, *id.* ¶¶ 84–88. In any case, the lesser-degree unlawful-access offenses apply with equal force and do not have a comparable fraudulent-purpose element. *See* KRS §§ 434.851–.853.

Finally, Johnson's personal and financial information was transmitted without his effective consent. Commonwealth did not provide its website users with an effective mechanism to opt out of information sharing until 2026. *See* D.E. 47 at ¶¶ 7, 33. Even setting this deficiency aside,

---

[2] Other relevant defined terms include "property," which covers data; "owner" includes "a person who has the right to restrict access to the property;" and "effective consent," which is not present if induced by deception or coercion or if consent is "[u]sed for a purpose other than that for which the consent is given." KRS § 434.840(9), (13), (14).

[3] A user's browser and device are "computers" or "computer systems" under the broad definitions supplied by KRS § 434.840(2), (6).

Johnson used Commonwealth's website for the narrow purpose of securing Commonwealth's financial services; Commonwealth, on the other hand, supplied the information to third parties for its own advertising benefit and for the benefit of fourth parties. *Id.* ¶¶ 29–30, 34, 74–78, 125. To the extent Commonwealth claims Johnson consented (and the operative pleading contends that he did not, at ¶¶ 127–129, 133), that consent was induced by Commonwealth's misleading privacy disclosures and therefore not "effective." KRS § 434.840(9). Count II of the Amended Complaint states a plausible claim for negligence per se. If the Court holds otherwise, Johnson respectfully requests that any dismissal be without prejudice and with leave to amend.

### C. Invasion of Privacy / Intrusion Upon Seclusion – Count Three

"The elements for a claim of intrusion upon seclusion are, (1) an intentional intrusion by the defendant, (2) into a matter that the plaintiff has a right to keep private, and (3) which is highly offensive to a reasonable person." *McKenzie*, 369 F. Supp. 3d at 819. "[A] defendant's actions may be intentional when the defendant acts with such reckless disregard for the privacy of the plaintiff that the actions rise to the level of being an intentional tort." *Pedersen v. Asbury Theological Seminary*, 2026 WL 2264169, at *5 (E.D. Ky. Aug. 5, 2026) (quoting *Silveria v. Commer. Specialty Truck Holdings, LLC*, 2025 WL 2323911, at *6 (E.D. Ky. Aug. 12, 2025)). The Western District of Kentucky recently denied a motion to dismiss an intrusion upon seclusion claim in a tracking-technology case involving similarly sensitive medical information. *Deidun v. Humana, Inc.*, 2026 WL 3026488, at *6–7 (W.D. Ky. Oct. 8, 2026) (holding class action plaintiffs plausibly alleged an intrusion upon seclusion claim). Kentucky federal courts have done the same in data breach cases. *Pedersen*, 2026 WL 2264169, at *5; *Bowen v. Paxton Media Grp., LLC*, 2022 WL 4110319, at *7–8 (W.D. Ky. Sept. 8, 2022).

Nevertheless, Commonwealth argues that Johnson had no reasonable expectation of privacy in the information he shared with Commonwealth. D.E. 53 at 25, PageID# 590 (citing *Pearce v. Whitenack*, 440 S.W.3d 392, 401 (Ky. Ct. App. 2014) ("*Courts in other jurisdictions* have held that to be actionable, a plaintiff must have a reasonable expectation of privacy in the matter." (emphasis added)). The alleged intrusion in *Pearce* was into a patrol officer's Facebook post that was found to violate department policy, ultimately leading to discipline and the officer's resignation. *Id.* at 400 (affirming dismissal for failure to exhaust administrative remedies). The *Pearce* court cited *United States v. Meregildo*, 883 F. Supp. 2d 523, 525 (S.D.N.Y. 2012), for its discussion of whether, in the Fourth Amendment context, an individual has an expectation of privacy in his social media posts. *Id.* at 401–02. Those facts have no application to the sensitive financial communications and browsing activity intruded upon in this case. Sending confidential financial exchanges about a person's application for credit is intrusive.

Commonwealth's other argument is that the Amended Complaint fails to plausibly "allege conduct that would be highly offensive to a reasonable person." D.E. 53 at 25, PageID# 590. But Commonwealth mischaracterizes the tracked information as mere "website-interaction data" and paints a misleading picture of the case law.

In its parenthetical explaining *In re Nickelodeon Consumer Privacy Litigation*, Commonwealth ignores the fact that the Third Circuit held the class stated a plausible intrusion upon seclusion claim with respect to Viacom. 827 F.3d 262, 293-95 (3d Cir. 2016) (finding Viacom's privacy representations contradicted its tracking practices such that a reasonable jury could find its collection of information highly offensive). Here, the Amended Complaint similarly alleges that Commonwealth's privacy representations blatantly contradicted the scope and breadth of its tracking, all while lacking a meaningful opt-out mechanism. *See* D.E. 47 ¶¶ 86–93, 104–06.

And in *Farst v. AutoZone, Inc.*, the court distinguished *Nickelodeon* because instead of "legally protected information" being tracked, the plaintiff "merely claim[ed] AutoZone observed and recorded his general actions on its website, revealing his shopping preferences regarding the company's products." 700 F. Supp. 3d 222, 231 (M.D. Pa. 2023). The stark contrast here is that the Amended Complaint includes dozens of allegations establishing the wide array of identifying personal and financial information that Commonwealth surreptitiously collected and transmitted to third parties, and the heightened protections such information is afforded. *See* D.E. 47 ¶¶ 1, 3–4, 43–55, 56–70, 107–23, 220–33; *see also Deidun*, 2026 WL 3026488, at *7 (finding the activities tracked went well "beyond routine web browsing data" and, "if exposed, would be highly offensive to a reasonable person") (citing *In re Grp. Health Plan Litig.*, 709 F. Supp. 3d 707, 714 (D. Minn. 2023)). Johnson has stated a claim for intrusion upon seclusion.

**D. Breach of Contract – Count Four**

"The elements of a breach of contract are 1) existence of a contract; 2) breach of that contract; and 3) damages flowing from the breach of contract." *Saner v. Cabinet for Health and Fam. Servs.*, 734 S.W.3d 778, 783 (Ky. App. 2026) (quoting *Metro Louisville/Jefferson Cnty. Gov't v. Abma*, 326 S.W.3d 1, 8 (Ky. App. 2009)). The difference between an express and implied contract is simply the method of proof: "A contract implied in fact is implied only in that it is to be inferred from the circumstances, the conduct, acts, or relation of the parties, rather than from their spoken words." *Univ. of Ky. v. Regard*, 670 S.W.3d 903, 919 (Ky. 2023) (quoting *Kellum v. Browning's Adm'r*, 21 S.W.2d 459, 465 (Ky. 1929)).

The elements of a valid contract include "an offer and unequivocal acceptance, a certain and complete recitation of the material terms, and consideration." *Britt v. Univ. of Louisville*, 628 S.W.3d 1, 5 (Ky. 2021). To incorporate outside terms, an agreement must have clear language of

incorporation. *Brass Reminders Co. v. RT Eng'g Corp.,* 844 F. App'x 813, 820-21 (6th Cir. Feb. 4, 2021). A party accepting an offer is presumed to know contract terms that reasonable diligence would bring to his attention. *Id.* at 821. At a minimum, the Amended Complaint plausibly alleges an express contract through the T&Cs and the privacy commitments they incorporate. The T&Cs repeatedly call themselves an "Agreement," establish the parties, and state that "[b]y submitting a Mobile Banking Service enrollment or your acceptance of Mobile banking service," the customer agrees to the Agreement's terms. D.E. 47-2 at 2. They also provide that pursuant to the agreement, Commonwealth "collect[s] only the information necessary to perform the transactions you request" and "will maintain the confidentiality and privacy of your account information in accordance with our privacy policy as stated on our website at: www.Commonwealthky.org." *Id.* at 13. Clearly, this is contractual language in a document Commonwealth drafted to govern mobile-banking and account-access services.

The incorporated Privacy Notice contains the confidentiality standard Commonwealth promised to follow. It tells customers that federal law requires Commonwealth to explain how it collects, shares, and protects personal information; identifies covered information such as Social Security numbers, account balances, payment history, credit history, and credit scores; states that Commonwealth does not share for affiliates' everyday business purposes, affiliates' marketing, or nonaffiliates' marketing; and states that Commonwealth uses safeguards that comply with federal law to protect information from unauthorized access and use. D.E. 47-1; D.E. 47 at ¶¶ 87–89. The operative complaint, however, alleges that Commonwealth's actual practice contradicted those promises by disclosing customer financial-service interactions and identifiers to third parties for analytics, marketing, and other secondary purposes without meaningful notice or opportunity to opt-out. D.E. 47 at ¶¶ 80–106.

Commonwealth's argument that Johnson did not plead that he read the T&Cs and Privacy Notice ignores the pleadings and the governing inference at this stage. Johnson alleges that he had a Commonwealth account, used Commonwealth's online banking portal and mobile app, used the website to apply for a loan, pay bills, check his account balance, and obtain financial services, and provided personal and financial information to Commonwealth at Commonwealth's direction. *Id.* ¶¶ 124–30, 234–40. Because he used the services the T&Cs govern, it is reasonable to infer he assented to the T&Cs—terms Commonwealth would presumably seek to enforce under favorable circumstances. In any event, the implied-contract theory independently survives because Johnson alleges that Commonwealth accepted his sensitive financial information in the course of providing financial services and, by doing so, implicitly promised to maintain the confidentiality and security of that information. *See McKenzie*, 369 F. Supp. 3d at 821–22 (holding plaintiffs adequately pled the existence of an implied contract to safeguard personal information provided as part of the parties' relationship); *Pedersen*, 2026 WL 2264169, at *5 (sustaining breach of implied contract claim "rest[ing] on the exchange of Private Information for educational services").

The Amended Complaint also plausibly alleges breach and contract damages, and Commonwealth's arguments to the contrary inappropriately seek to hold Johnson to a heightened pleading standard. Commonwealth promised to collect only information necessary to perform requested mobile-banking transactions, maintain account-information confidentiality in accordance with its website privacy policy, and disclose electronic-funds-transfer information to third parties only in limited circumstances such as completing transfers, verifying sufficient funds, complying with legal process, or with express permission. D.E. 47-2 at 13. The Amended Complaint alleges Commonwealth instead transmitted financial-service events, application-stage information, and persistent identifiers to third parties for analytics, advertising, marketing, and

profit, while telling customers it did not share personal information for that purpose. *Id.* ¶¶ at 83–91. Johnson further alleges he would not have used Commonwealth's services, or would have paid less for them, had he known the truth, and that he lost the privacy protections that formed part of his bargain. *Id.* ¶¶ 137, 238–40. That is enough for Count IV to proceed.

**E. Unjust Enrichment – Count Five**

An unjust enrichment claim consists of: "(1) benefit conferred upon defendant at plaintiff's expense; (2) a resulting appreciation of benefit by defendant; and (3) inequitable retention of benefit without payment for its value." *Certified Restoration Servs., Inc. v. Fitzgerald*, 739 S.W.3d 47, 61 (Ky. App. 2026) (emphasis omitted).[4] The Western District of Kentucky recently sustained an unjust enrichment claim in a similar tracking-technology case. *Deidun*, 2026 WL 3026488, at *8 (finding all three elements plausibly pled).

Commonwealth challenges only the first element of unjust enrichment. That is, a plaintiff must show he directly conferred a benefit on the defendant. *Simpson v. Champion Petfoods USA, Inc.*, 397 F. Supp. 3d 952, 973 (E.D. Ky. 2019). To argue Johnson failed to meet this standard, Commonwealth analogizes this case to a single, inapposite case. In *Marathon*, an antitrust suit involving Kentucky's dominant gasoline supplier, the Commonwealth's unjust enrichment claim failed because its pleading acknowledged that Marathon's monopolistic "conduct conferred a benefit upon itself." *Commonwealth of Kentucky v. Marathon Petroleum Co., LP*, 191 F. Supp. 3d 694, 706 (W.D. Ky. 2016). Thus, the Commonwealth could only allege an insufficient indirect

[4] Johnson may plead unjust enrichment in the alternative to contract claims under Fed. R. Civ. P. 8(d). *See Walters v. Gill Indus., Inc.*, 586 F. Supp. 3d 633, 645 (E.D. Ky. 2022) ("A plaintiff can pursue breach of contract and unjust enrichment as alternative theories of liability based on the same core facts."); *Carter v. Paschall Truck Lines, Inc.*, 324 F. Supp. 3d 900, 917-18 (W.D. Ky. 2018); *AgTech Scientific, LLC v. Blue Circle Dev., LLC*, 2020 WL 1975375, at *4 (E.D. Ky. April 24, 2020).

benefit theory—"Marathon charged anticompetitive prices for [reformulated gasoline]; retailers then passed the cost to customers; customers paid these prices; and Marathon profited." *Id.* at 707; *see also Simpson*, 397 F. Supp. 3d at 974 (similar cost-passing theory deemed "contrary to the general purpose of an unjust enrichment claim, which exists to compensate for benefits conferred, not loss suffered").

Johnson's claim has no such intermediary. He "inputted his Personal and Financial Information into Defendant's Website at Defendant's direction and encouragement." D.E. 47 at ¶¶ 125, 130, 242, 243. No third party stood in the way of Johnson's information and Commonwealth's decision regarding what to do with it. Indeed, elsewhere Commonwealth urges that it "was a party to and the intended recipient of Johnson's communications through the website." D.E. 53 at 24.

Nonetheless, Commonwealth contends there were "multiple intervening steps" before it benefitted, such as "transmission through third-party trackers, analysis of Johnson's information, generation of marketing insights, and use of those marketing insights[.]" *Id.* at 21. This argument confuses conferral of a benefit with its subsequent exploitation. The steps Commonwealth lists—which all occurred *after* Commonwealth received Johnson's sensitive information—describe how it appreciated and used a benefit already in hand. *See* D.E. 47 at ¶ 245.

That distinction matters, and a hypothetical is illustrative. Consider an account holder who deposits $1,000 at Commonwealth, which Commonwealth then lends to a borrower at interest. No one would say the account holder conferred a benefit on Commonwealth "indirectly" because Commonwealth's profit came from a downstream borrower. The same is true here. Nothing in *Marathon* suggests that a defendant who receives a benefit directly can defeat an unjust enrichment claim by pointing to what it later did with that benefit. Johnson alleges he provided valuable personal and financial information directly to Commonwealth at Commonwealth's direction, that

Commonwealth appreciated the benefit, and that Commonwealth used the information for marketing and profit without sharing that value with him. *See Deidun*, 2026 WL 302688, at *8 (finding the benefit conferred "took the form of 'valuable personal health-related information'"); *Pedersen*, 2026 WL 2264169 at *7 (benefit was providing private information as a condition of receiving services); *Bowen*, 2022 WL 4110319, at *8 (knowing enrichment through cost-savings that should have been used to protect private information held to be a direct benefit for purposes of unjust enrichment); D.E. 47 at ¶¶ 125, 242–49. Johnson's unjust enrichment claim is well pled.

**F. Bailment – Count Six**

"A bailment occurs when one person (the bailor) delivers possession of some personal property to another person (the bailee)." *Mezo v. Warren Cnty. Pub. Library*, 2010 WL 323302, at *2 (Ky. Ct. App. Jan. 29, 2010). A critical element of a bailment is that the property is returned or duly accounted for when the purpose of the bailment is accomplished. *Id.* Commonwealth argues that Johnson's data cannot constitute personal property. But Kentucky law defines "property" to include "data" in the unlawful-access statute, KRS § 434.840(14), and Indiana has reached the same conclusion in the bailment context. *Krupa v. TIC International Corp.*, 2023 WL 143140, at *5 (S.D. Ind. Jan. 10, 2023) ("In Indiana, bailment law is not reserved for physical goods. Indiana recognizes data as a form of property."). Johnson also alleges more than a generalized possession of information: he transmitted personal and financial information to Commonwealth for the specific purpose of obtaining financial services, Commonwealth was required to safeguard and account for that data consistently with that limited purpose, and Commonwealth instead used it for a different, unauthorized purpose. D.E. 47 at ¶¶ 251–55. These allegations plausibly state a breach of bailment.

**G. KCPA – Count Seven**

KRS § 367.220(1) provides a cause of action for persons who purchased or leased goods or services primarily for personal, family or household use and "thereby suffer[ed] any ascertainable loss of money or property" from another's use or employment of an "act or practice declared unlawful by KRS § 367.170."[5] Commonwealth only contests whether Johnson sufficiently alleged an ascertainable loss caused by the challenged practice.[6] D.E. 53 at 32, PageID# 597; *see Holland v. United Servs. Auto. Ass'n,* 707 S.W.3d 541, 555 (Ky. Ct. App. 2025).

The Kentucky Supreme Court has said that the legislature intended the KCPA to have "the broadest application in order to give Kentucky consumers the broadest possible protection for allegedly illegal acts." *Stevens v. Motorists Mut. Ins. Co.*, 759 S.W.2d 819, 821 (Ky. 1988). In that vein, this Court has endorsed an unpublished Kentucky Court of Appeals case construing "ascertainable loss" broadly to include harms beyond "out-of-pocket expenses/damages." *Foster v. Am. Fire & Cas. Co.*, 219 F. Supp. 3d 590, 599–600 (E.D. Ky. 2016) (citing *Complete Auto. Repair Servs. v. Capps*, 2015 WL 2445911, at *5 (Ky. Ct. App. May 22, 2015)). In *Capps*, the court considered Black's Law Dictionary definitions of "loss" and "damages," observed that the

---

[5] KRS 367.170(1) provides, "Unfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." "Trade" and "commerce" are defined broadly to mean "the advertising, offering for sale, or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value, and shall include any trade or commerce directly or indirectly affecting the people of this Commonwealth." KRS 367.110(2); *see also Craig & Bishop, Inc. v. Piles*, 247 S.W.3d 897, 902–03 (Ky. 2008) (construing "purchase" broadly); *Stafford v. Cross Country Bank*, 262 F. Supp. 2d 776, 792 (W.D. Ky. 2003) (extension of credit is a KCPA "service").

[6] Commonwealth's unsubstantiated parenthetical assertions regarding other KCPA elements are undeveloped and therefore waived. *See Estep v. Combs*, 366 F. Supp. 3d 863, 882 (E.D. Ky. 2018) (finding defendant's facial plausibility challenges inadequately developed) (citing *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997)). In any event, they ignore paragraphs 125 and 261 of the Amended Complaint.

legislature used "actual damages" elsewhere in the KCPA and thus "appreciated the difference between the two terms," and held:

> We conclude that a person is not required to allege a specific amount of actual damages that he has already incurred as out-of-pocket expenses to make out a prima facie case under KRS 367.220. If the consumer proves that he has purchased an item that is different from or inferior to that for which he bargained, the "ascertainable loss" requirement is satisfied.

*Capps*, 2015 WL 2445911, at *5.

Johnson alleges that he paid for financial services that included privacy protections which he did not receive. D.E. 47 at ¶¶ 137, 261–65, 274. He alleges that he would not have used Commonwealth's services, or would have paid less for them, had he known the truth. *Id.* at ¶¶ 244, 267. That is exactly the loss *Capps* recognized: Johnson "purchased an item that is different from or inferior to that for which he bargained." 2015 WL 2445911, at *5. Commonwealth's insistence that Johnson must identify an "overcharge, lost funds, . . . or account impairment" simply mirrors the out-of-pocket requirement that *Capps* and *Foster* reject. D.E. 53 at 23. Johnson's allegations that he and putative class members lost the benefit of their bargains and suffered diminution of the value of their personal and financial information, among other harms, are ascertainable losses under *Capps* and *Foster*. D.E. 47 at ¶¶ 137, 204, 269.

Causation does not present a separate obstacle. The injuries Johnson suffered occurred precisely because Commonwealth secretly configured its services to disclose members' financial interactions while representing that it would not. Commonwealth's own post-suit revisions to its privacy disclosures confirm that the omitted facts were material to the bargain. Johnson's KCPA claim states a claim upon which relief can be granted.

**H. ECPA – Counts Eight Through Ten**

Plaintiff's claims under the ECPA are well pled. As Commonwealth recognizes, this case

implicates the crime-tort exception to Section 2511. D.E. 53 at 34, PageID# 599 (contending the exception does not apply here). The ECPA addresses intentional interception of the contents of an electronic communication. *Stein v. Edward-Elmhurst Health*, No. 23-CV-14515, 2025 WL 580556, at *3 (N.D. Ill. Feb. 21, 2025). The statute has an exception called the one-party consent rule, meaning a party cannot intercept its own communications. But that exception does not apply if the interception is done for a criminal or tortious act. The best explanation of how this exception works invokes the famous comic book character Batman:

> To illustrate the statute, consider a hypothetical about jaywalking. Imagine if the City of Chicago banned jaywalking, with one exception. Imagine if the City of Chicago allowed jaywalking if a person is by himself, unless that person jaywalks for the purpose of committing a crime or tort.
>
> Suppose that the Joker jaywalked by himself for the purpose of robbing Gotham Bank across the street. In that scenario, the "crime or tort" is not the jaywalking. The crime or tort is the bank robbery. So the carve-out to the exception would apply. And Commissioner Gordon could give the Joker a ticket for jaywalking (in addition to arresting him for robbing the bank).
>
> But imagine if the Joker jaywalked by himself for the purpose of saying hello to the Penguin across the street. Saying hello to the Penguin is not a crime or a tort. So, the carve-out to the exception would not apply. In that situation, the Joker would not violate the jaywalking ordinance – he jaywalked, but he was by himself, and he didn't jaywalk to commit a crime or tort.

*Stein*, 2025 WL 580556, at *4 (N.D. Ill. Feb. 21, 2025). Here, Plaintiff alleges, among other things, that Commonwealth delivered private financial information to tech companies for its own gain. D.E. 47 at ¶¶ 29, 246, 247, 264, 291. That is a tort – like negligence or intrusion upon seclusion. So the crime-tort exception applies here.

Courts nationwide have correctly found that the exception applies in circumstances like those here. *Riganian v. LiveRamp Holdings, Inc.*, 791 F. Supp. 3d 1075, 1091 (N.D. Cal. July 18, 2025) ("Because Plaintiffs have otherwise adequately alleged that LiveRamp intercepted their communications for the purpose of 'associating their data with preexisting [identity] profiles' and

then preparing that data for sale on LiveRamp's data marketplace—triggering the crime-tort exception and rendering consent an inapplicable defense—the Court declines to dismiss their Wiretap Act claim.") (internal citations omitted); *Shah v. Cap. One Fin. Corp.*, 768 F. Supp. 3d 1033, 1053 (N.D. Cal. 2025) (similar). And courts in the Sixth Circuit have said much the same even in recent weeks. *Deidun v. Humana, Inc.*, No. 3:26-CV-00054-GNS, 2026 WL 3026488, at *4 (W.D. Ky. Oct. 8, 2026) (applying crime-tort exception and declining to dismiss ECPA claims); *Wehrle v. McLaren Health Care Corp.*, No. 25-CV-11420, 2026 WL 2719088, at *6 (E.D. Mich. Sept. 15, 2026) (same); *see also generally Small v. Multicare Health System*, No. 3:24-CV-05552-LK, 2026 WL 3181181, at *6–7 (W.D. Wash. Oct. 23, 2026); *B.N. v. Oregon Reprod. Med., LLC*, No. 3:25-CV-00202-IM, 2025 WL 3165965, at *5 (D. Or. Nov. 12, 2025).

Commonwealth also argues that Plaintiffs' claim under Section 2511(3)(a) of the ECPA in Count Thirteen cannot proceed. D.E. 53 at 38, PageID# 603. The language of the statute is clear: an electronic communication service is "any" service that provides users with the ability to send or receive electronic communications. 18 U.S.C. § 2510(15). Courts have allowed these claims to proceed beyond the Rule 12 stage. *In re BetterHelp, Inc.*, No. 23-CV-01033-RS, 2024 WL 4504527, at *2 (N.D. Cal. Oct. 15, 2024). It should proceed.

**I. CFAA – Count Eleven**

In the interest of narrowing the issues before the Court, Johnson voluntarily withdraws Count XI as pled. This concession, however, does not aid Commonwealth's motion as to the remaining claims. In fact, the allegations that limit the CFAA theory—specifically, the absence of a functional opt-out mechanism (continued tracking after opt-out presents a strong CFAA claim)—bolster Johnson's consent, privacy, contract, and consumer-protection theories. D.E. 47 at ¶¶ 7, 33, 94–106.

**J. Kentucky Wiretap Act – Count Twelve**

Kentucky makes it illegal to "intentionally use[] any device to eavesdrop." KRS § 526.020. This is a penal statute, but KRS § 446.070 provides a civil recovery mechanism for eavesdropping.

"Eavesdrop" is defined as "to overhear, record, amplify or transmit any part of a wire or oral communication of others without the consent of at least one (1) party thereto by means of any electronic, mechanical or other device." KRS § 526.010. Unlike its federal counterpart discussed above, Kentucky eavesdropping neither encompasses electronic communications nor defines "wire communication." Given its ordinary meaning, a communication carried over cables, fiber, or wired networks is a communication by wire, and the statute reaches "any part of" such communication. Here, it is plausible that part of Johnson's communications occurred by wire, and Commonwealth recorded and transmitted them to third parties by means of tracking technologies. *See Luis v. Zang*, 833 F.3d 619, 629-31, 641 (6th Cir. 2016) (monitoring software treated as interception device).

Johnson acknowledges that "Kentucky is a one-party consent state for purposes of recording conversations." *Radcliff v. Commonwealth*, 2023 WL 8639385, at *5 (Ky. 2023). However, "states may enact wiretapping statutes that are more restrictive than Title III [18 U.S.C. §§ 2510 *et seq.*], but [] Title III sets the minimum requirements for all wiretapping and [] none may permit wiretapping on a basis less restrictive than Title III." *United States v. Spence*, 2008 WL 11417828, at *15 (E.D. Tenn. Apr. 22, 2008), *aff'd sub nom. United States v. Smith*, 395 F. App'x 223 (6th Cir. 2010). Construing Kentucky's one-party consent policy to include a crime-tort exception similar to its federal counterpart is consistent with this requirement and Kentucky's strong history of protecting privacy. *See* 18 U.S.C. § 2511(2)(d); *Commonwealth v. Wasson*, 842 S.W.2d 487, 493 (Ky. 1992). This Court should hold as much and find Count XII well pled.

## CONCLUSION

Online tracking cases pose difficult questions for courts. That is why Plaintiff here has alleged a number of different alternative theories, because no two district courts have the same take on cases like these. But the allegation here is simple: Commonwealth took confidential financial information and shared it without consent. That conduct runs afoul of numerous laws and duties. But Plaintiff Johnson unquestionably has standing to redress that conduct. And his claims pass muster under Rule 12. The motion should be denied.

Dated: November 12, 2026

Respectfully submitted,

*/s/ Michael Tackeff*

Andrew E. Mize (Ky. Bar No. 94453)
J. Gerard Stranch, IV*
Michael Tackeff
STRANCH, JENNINGS & GARVEY, PLLC
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
T: (615) 254-8801
F: (615) 255-5419
gstranch@stranchlaw.com
amize@stranchlaw.com

Lynn A. Toops*
COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
T: (317) 636-6481
ltoops@cohenandmalad.com

Samuel J. Strauss*
Raina C. Borrelli*
STRAUSS BORRELLI, PLLC
980 N. Michigan Avenue, Suite 1610
Chicago, Illinois 60611
T: (872) 263-1100
F: (872) 263-1109
sam@straussborrelli.com
raina@straussborrelli.com

* to seek admission *pro hac vice*

***Counsel for Plaintiff and the Proposed Classes***